IN THE UNITED STATES DISTRICT COURT FOR THE  EASTERN DISTRICT OF

MISSOURI

EASTERN DIVISION

| | |
|---|---|
| | ) JURY TRIAL DEMAND |
| ROBERT MCCRARY | ) |
| | ) |
| AND | ) Case No. 4:10-CV-00295 CEJ |
| | ) |
| KENNETHC. THOMPSON | ) |
| | ) |
| PLAINTIFFS | ) |
| | ) |
| AND ON BEHALF OF OTHERS | ) |
| SIMILARLY SITUATED | ) |
| | ) |
| V. | ) |
| | ) |
| STIFEL,NICOLAUS & COMPANY, | ) |
| INCORPORATED ET AL | |

**MEMORORANDUM IN SUPPORT OF ISSUANCE OF A PRELIMINARY INJUNCTION TO PROHIBIT DEFENDANTS STIFEL AND COMPTON PROCEEDING WITH THE FINRA ARBITRATION OF KENNETH C. THOMPSON V. STIFEL ET AL: FINRA CASE NO. 09-03580**

This Counsel shall always attempt to conduct himself in a civil manner not only as a

matter of professional ethics and courtesy, but also as reminded by this Honorable

Court's web page.  However, despite the admonitions contained in the previously filed

Memorandum, despite attempts to meet and confer and meeting and conferring with

counsel for Stifel and offering participation in this Honorable Court's Early Neutral

Evaluation Program without conditions and agreeing to retired Judge Stephen N.

Limbaugh Sr. as the ENA mediator; Stifel has and proceeds to issue discovery,

subpoenas directed to Mr. Thomspson's  CPA for tax information absolutely confidential

under the I.R.C.; and attempts to  proceed with the arbitration of July 20, 2010 in front of

a presumptively disqualified arbitrator. The Chairmen, Keith D. Patten, made

misrepresentations of material fact in the Prehearing Conference on  December 10,2009.

Patten claimed to  have issued a AAA award against Stifel that was reportable by Stifel

under Form BD. Investigation of the files and records of the SEC reveals no such award

exists. See Record of Prehearing Conference Exhibit 1  Page 5. In that hearing Mr. Patten

claims to have rendered an award against Stifel that Stifel had a duty to report to the SEC

but have not been reported. The panel refuses to issue a subpoena to the American

Arbitration Award to obtain such award, which is confidential and cannot obtained

without a subpoena. Further, Mr. Patten admits that  he has not read   the Canon of

Ethics. Exhibit 1 Page 9


   Stifel has waived any rights to arbitration in this matter by failing to file a Motion to

Dismiss under Fed R. Civ Pro. Rule 10 (b) (5) and filing a Motion to Compel Arbitration

under the Federal Arbitration Act; 9 U.S.C. 1 et seq at the time Plaintiff's sought leave to

amend to include Mr. Thompson's claims under the Federal Securities Exchange Act of

1934. Previously after meeting and conferring with counsel for Stifel, this Counsel

Moved to Dismiss without prejudice the pending FINRA action. At the same time,

Stifel's counsel filed an  Opposition to Mr. Thompson's Motion to Dismiss. When Mr.

Thompson filed a Motion to reconsider the FINRA panel's denial of  Mr. Thomson's

Request to Stay and the panel's failure to act on the Motion to Dismiss without prejudice

the FINRA proceedings on Thursday via fax on April 23, 2010 to FINRA, counsel for

Stifel,  and  FINRA'a case manager, Matt Leuzi and the other parties. See Exhibit 2. Mr. Leuzi thereafter  faxed a decision of the panel dated April 16, 2010 denying Plaintiff's Motion to Dismiss.Exhibit  3. Meanwhile, the FINRA matter and orders are presently before the   President of FINRA regulation and T. Grant Callery General Counsel for the FINRA Board of Governors.

   In the meantime despite efforts to meet and confer regarding discovery, failure to obtain any of the discovery presumptively appropriate under the FINRA Rules, including Mr. Harrison's  exception  reports,  complete  customer  file  of  Mr.  Thompson,  telephone records, counsel was advised by Stifel counsel that no such material exists.  The lack of such files and materials, required by the  SEC Rules to be preserved for 10 years makes a submissible case of Control Person Liability under Securities and Exchange Act Section 20 (15 U.S.C. Sec. 78t). Indeed, Plaintiffs could move for summary judgment on the issue of control person liability of Stifel alone, if such representations be true.

   In the meantime, Mr. Harrison a necessary and indispensable party to any litigation is presently incarcerated at the Bureau of Prisons at Millington, TN having plead guilty to one count of mail fraud. See **United States v. Harrison**, United States District Court for the Southern District of Illinois, Case No.09-30053. Mr. Harrison has filed a Chapter 7 proceeding in the United  States Bankruptcy Court for the Southern District of Illinois**; In re Harrison**  Case No. 09-32990 where he attempts to discharge the claims not only of Mr.  Thompson  and  Mr.  McCrary,  but  all  customer  claims  but  criminal  restitution amounts ordered by the Court to Mr. McCrary and other victims, other victims and members of the proposed class, many of whom are elderly; civil fines imposed by the Securities  Division  of  the  State  of  Illinois;  and  Defendant  Stifel.  As  a  result,  the

automatic stay provisions of    11 U.S.C. Sec. 362  preclude this Counsel  from serving summons  on Mr. Harrison in this matter and the FINRA matter are stayed as to him. Stifel has taken no action to seek relief from Stay and this Counsel and his clients cannot fairly be subjected to the cost and expense of retaining bankruptcy Counsel and seeking a lift stay order or filing yet another matter, an adversary proceeding.

 In the meantime Counsel and his client Thompson are subject to ongoing discovery orders and potentially sanctions by the FINRA panel for failing to comply with discovery orders which defendant's counsel has obtained from the panel and Defendants fails and refuse to make any discovery. Although Stifel counsel asserts prodigious efforts and massive discovery production, in fact all that has been produced are records in Mr. Thompson's possession Bated 0001-1980 and Mr. Thompson has produced all account statements from Stifel and  AG Edwards going back 7 years.

    The Motion for Extension filed in this Honorable Court   which was represented to be for the purpose of complying with  SLUSA and the PSLRA in fact was a sub rosa attempt to evade this Courts jurisdiction with FINRA arbitration in the case of **Thompson v. Stifel** ,FINRA No. 09-03580 and is proceeding, in violation of FINRA Rule 122204, express regulations duly promulgated by the SEC and the PSLRA.


The General Counsel of Stifel, David Minnick Esq. is an honorable man. Counsel has had professional and amicable relations with Mr. Minnick since the time he was Regional Counsel for the then NASD in Kansas City and litigated NASD arbitration cases with Mr. Minnick when he was staff counsel for the former A.G. Edwards. One can only wonder, if Mr. Minnick has been kept advised of the course of these proceedings. The failure to produce the Exception Reports of Mr. Harrison which reveal churning of Mr. Thompson's account in the astronomical range of 100:1 may in fact be a predicate felony

for  RICO civil claims under 18 U.S.C. Sec.1960 and 18 U.S.C. 1964(a). It may be

suppression and concealment of facts amounting to a federal felony in violations of

Missouri Supreme Court Rules 4-3.3 (a) (1); 4-3.3 (a) (2);  4-8.4 (a) and 4-8.4 (c).

Counsel fervently hopes, indeed prays that this is not the case. But this counsel has

ethical duties to this Court, his clients, and others which require that this be pointed out

now, so that  Stifel may cure any such conduct, by producing the Exception Reports,

McCrary and Thompson  customer files and all other material  germane to the retention

and of  Harrison now  to this Honorable Court and  Counsel for Plaintiffs herein under

Seal.

 The PSLRA was enacted to  curb abusive filings. It cannot be a one- way street.  The

PSLRA must be applicable to all parties. The PSLRA creates a presumption that the

Plaintiff with the greatest financial interest, in the instant case, Mr. Thompson should be

lead Plaintiff. 15 USC.  78u-4. In addition FINRA and SEC Rules and prior decisions of

this Court and the Eighth Circuit clearly preclude arbitration.

**12204. Class Action Claims The Customer Code applies to claims filed on or after
April 16, 2007. In addition, the list selection provisions of the Customer Code apply
to previously filed claims in which a list of arbitrators must be generated after April
16, 2007; in these cases, however, the claim will continue to be governed by the
remaining provisions of the old Code unless all parties agree to proceed under the
new Code.**

(a) Class action claims may not be arbitrated under the Code.

(b) Any claim that is based upon the same facts and law, and involves the same
defendants as in a court-certified class action or a putative class action, or that is ordered
by a court for class-wide arbitration at a forum not sponsored by a self-regulatory
organization, shall not be arbitrated under the Code, unless the party bringing the claim
files with FINRA one of the following:

(1) a copy of a notice filed with the court in which the class action is pending that the
party will not participate in the class action or in any recovery that may result from the
class action, or has withdrawn from the class according to any conditions set by the court;

(2) a notice that the party will not participate in the class action or in any recovery that may result from the class action.

(c) The Director will refer to a panel any dispute as to whether a claim is part of a class action, unless a party asks the court hearing the class action to resolve the dispute within 10 days of receiving notice that the Director has decided to refer the dispute to a panel.

 A member or associated person may not enforce any arbitration agreement against a member of a certified or putative class action with respect to any claim that is the subject of the certified or putative class action until: The class certification is denied;
•        The class is decertified;
•        The member of the certified or putative class is excluded from the class by the court; or
•        The member of the certified or putative class elects not to participate in the class or withdraws from the class according to conditions set by the court  . This paragraph does not otherwise affect the enforceability of any rights under this Code or any other agreement.

Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008. Adopted by SR-NASD-2003-158 eff. April 16, 2007.

**Selected Notice:** 07-07, 08-57.

 While purporting to seek an Extension from this Court because of  the complexities of the PSLRA 15 U.S. C. 77u-4, this issue is not complex at all. Stifel has filed an Opposition to Mr. Thompson's Motion to Dismiss in the FINRA action filed by Mr. Thompson before this matter was filed by Mr. McCrary and removed to  this Court by Stifel. Under the express terms of the PSLRA, a presumption exists that Mr. Thompson should be lead Plaintiff.   The Motion to Dismiss is contrary to this FINRA Rule 12204 which exempts class actions and putative class actions from arbitration proceedings by means of counter factual statements as discussed below. Stifel has continued to issue subpoenas in the FINRA case to Mr. Thompson's accountant and at the same time, and failing to make discovery as promised, continuing to insist that the Harrison exception reports be subject to a confidentiality order, and not producing same. Hence, plaintiffs discovery in this action is stayed under PSLRA, yet Defendants proceed to have discovery subpoenas served and seek to proceed with Mr. Thompson's arbitration

scheduled for July 20, 2010. To fail to inform the Court of the pendency of the FINRA

matter, its Opposition to Mr. Thompson' Motion to Dismiss without prejudice the

arbitration filed before the McCrary class action which Stifel removed to this Court

amounted  to  a preemptive strike before the FINRA panel and  attempted to defeat the

jurisdiction of this Court under  the Federal Securities Exchange Act and under the

Federal Arbitration Act, 9 U.S.C. Sec 1 et seq. Moreover, assuming arguendo, that this

matter somehow proceeded to arbitration in respect to Thompson's claims for relief; that

does not resolve the Mccrary Claim and Plaintiffs counsel will timely seek class

certification, appointment as lead counsel and appointment of lead plaintiff as soon as

allowed under the PSLRA.  As recently recognized by the District Court of Minnesota**,**

**Bakas v. Ameriprise Financial Services, Inc.**, 651 F.Supp.2d 997 (D. Minn. 2009):


Bakas is correct that the rule states that a FINRA "member may not enforce any
arbitration agreement against a member of a certified or putative class action." FINRA
Code § 12204(d) (last visited September 2, 2009) (emphasis added). But FINRA's rules
define the term "member" as "any broker or dealer admitted to membership in FINRA."
See id. § 12100(r) (last visited September 2, 2009) (emphasis added). Hence, it is clear
that the rules refer to the activities of a broker/dealer, not an investment adviser, when
precluding arbitration by a "member." The Eighth Circuit has recognized this distinction.
See **Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.,** 264 F.3d 770, 772 (8th
Cir. 2001) (noting that member of NASD (FINRA's predecessor) "did not, by virtue of its
membership in NASD, agree to arbitrate this . . . dispute over fees for giving financial
advice apart from brokerage services").

 Although the Court in Bakas ordered arbitration; Bakas claim was based upon the
Investment Advisor's Act of 1940 which is not to FINRA Rule 122804.  Stifel should
have filed a Motion toCompel Arbitration in this Court as soon as the First Amended
Petition was filed and before thisHonorable Court granted Leave to Amend to file its
First Amended Complaint.

    In the first instance under the Federal Arbitration Act, 9 U.S.C. Sec 1 et seq. it is for

this Honorable Court to determine arbitrability and under the Federal Securities

Exchange Act including the PSLRA Amendments. See for e.g. **Shearson v. American**

**Express v. McMahon,**482 U.S. 220 (1987), **Mastruobono v. Shearson, Lehman,**

**Hutton Inc**. 514 U.S. 52 (1995),

Most recently, the United States Supreme Court held that:

   Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. See id., at 943-946 (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); John Wiley & Sons, Inc. v. Livingston, 376 U. S. 543, 546-547 (1964) (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. See, e. g.,AT&T Technologies, supra, at 651-652 (holding that a court should decide whether a labor-management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); Atkinson v. Sinclair Refining Co., 370 U. S. 238, 241-243 (1962) (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).

         At the same time the Court has found the phrase "question of arbitrability" not applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus "`procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively not for the judge, but for an arbitrator, to decide. John Wiley, supra, at 557 (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hospital, supra, at 24-25. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate [537 U.S. 85] the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and comment 2, 7 U. L. A. 12-13 (Supp. 2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability ... are for a court to decide and issues of procedural arbitrability, i. e., whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." Id., § 6, comment 2, 7 U.
L. A., at 13 (emphasis added).
         Following this precedent, we find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability." E. g., Moses H. Cone Memorial Hospital, supra, at 24-25 (referring to "waiver, delay, or a like defense"). Such a dispute seems an "aspec[t] of the [controversy] which called the grievance procedures into play." John Wiley, supra, at 559.
                   . **Howsam v Dean Witter Reynolds**,537 U.S. 79 84-86 (2002)

First, it must be noted that only the Eight Circuit  and this Court as set forth below have addressed the interpretation of the PSLRA, SLUSA or the Security and Exchange Commission's plenary authority over NASD or FINRA in the class action context under the Federal Arbitration Act. Prior authority from other Circuits and courts within this Circuit does address that the NASD (now FINRA) has no standing to contest the Securities and Exchange Commission in the adjudicative context **National Ass'n of Securities Dealers, Inc. v. S.E.C.**, 431 F.3d 803, 812 ( D.C. Cir. 2005) Second, waiver is an issue here. See **Parler et al v. KFC**, **529 F.Supp.2d 1009 (D.Minn. 2008).** Finally in the class action context addressing antitrust claims the United States Court of Appeals for the Second Circuit, held that the interest of class members whose claims are too small to litigate, was a bar to arbitration of a class action **In re American Express Merchant's Litigation** 554 F.3d 300, 313-314 (2d Cir. 2008)

The Supreme Court has at least implicitly held that a provision in an arbitration agreement barring class procedures is not per se unenforceable because, as noted above, it held in Bazzle that the question of whether or not an ambiguous arbitration clause contained a class action ban was a matter for the arbitrator, not the court, to decide. 539 U.S. at 453, 123 S.Ct. 2402. Beyond this oblique ruling, however, the Supreme Court has yet to squarely face the question of whether or not there are conditions under which a class action ban would be incompatible with the FAA. But, as both parties here acknowledge, the Court has decided cases which involved matters which, if ancillary, are certainly pertinent to this question.

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), involved a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Specifically, the plaintiff, a manager at a brokerage firm, asserted that he had been terminated by the firm in violation of the ADEA. Id. at 23, 111 S.Ct. 1647. After the plaintiff had filed suit in federal district court, the defendant firm moved to compel arbitration pursuant to a mandatory arbitration provision contained in the rules of the New York Stock Exchange ("NYSE"), to which the plaintiff had agreed to be bound when he became a registered securities representative. Id. at 23-24, 111 S.Ct. 1647.

The Court held that because "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement," the arbitration clause was enforceable "`unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the

9

statutory rights at issue.'" Id. at 26, 111 S.Ct. 1647 (quoting <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)</u>). Even though the Court acknowledged that "the ADEA is designed not only to address individual grievances, but also to further important social policies," id. at 27, 111 S.Ct. 1647, the Court could discern no Congressional intent to preclude ADEA claims from being subject to arbitration. The Court also considered the plaintiff's argument to the effect "that arbitration procedures cannot adequately further the purposes of the ADEA because they do not provide for broad equitable relief and class actions." Id. at 32, 111 S.Ct. 1647. The Court rejected this  contention As the court below noted, however, arbitrators do have the power to fashion equitable relief. Indeed, the NYSE rules applicable here do not restrict the types of relief an arbitrator may award, but merely refer to "damages and/or other relief." The NYSE rules also provide for collective proceedings. But even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the ADEA provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred. Id. (citations, internal quotation marks, and brackets omitted).

In the **AMEX** case the NYSE rules expressly allowed for class actions.  Now that

FINRA has consolidated the NYSE, AMEX and NASD, the clear  import  is that this is a

threshold question for the Court, not a FINRA panel. This is not a question for which a

FINRA panel has superior fact finding competence or expertise. Indeed FINRA has

expressly proscribed the enforcement of arbitration agreements when a putative class

action is pending  in FINRA Rule 12204.  The United States Court of Appeals for the

Eight Circuit has addressed this issue before  See **Piper Funds, Inc., Institutional**

**Government Income Portfolio Litigation**, 71 F.3d 298 (8th Cir. 1995) and in **Green v.**

**Ameritrade, Inc.,** 279 F.3d 590 (8th Cir. 2002). In fact Judge Heaney cited the complex

interplay among the provisions of SLUSA, the PLSRA, in affirming the issuance of an

injunction against among other things state court actions and alternative dispute

resolution:  The court concluded that PSLRA's lead-plaintiff provisions created new

federal rights for certain plaintiffs in securities class-action lawsuits. Specifically, the

court noted that the PSLRA, in response to abuses by professional plaintiffs and their

attorneys, vested the control over such litigation in the plaintiff with the greatest financial

stake, thereby eliminating the "race to the courthouse" system. The court further noted that the federal plaintiffs represented more than twenty-six times the amount of stock represented by the Desmond plaintiffs, and that the Desmond plaintiffs had entered settlement negotiations after only "minimal written discovery and document exchanges" and before taking a single deposition. **BankAmerica II, 95 F.Supp.2d at 1050**.Singling out Milberg Weiss, the court chastised the firm for engaging in "precisely the sort of lawyer-driven machinations the PSLRA was designed to prevent**." Id.** In the district court's view, the Desmond case was "nothing more than a thinly-veiled attempt to circumvent federal law." **Id.** The district court concluded that the federal right of control by the greatest stakeholder could not "be given its intended scope if competing state court plaintiffs, representing a significantly smaller number of shares, [could] institute premature settlement negotiations which threaten the orderly conduct of the federal case and which could result in the release of the federal claims." Id. at 1049.  The court granted a broad injunction that (1) barred the named Desmond plaintiffs from prosecuting any class action claims arising out of the BankAmerica merger; (2) barred the California court from certifying any Desmond plaintiff classes; (3) barred the California court from ordering any alternative dispute resolution in Desmond and directed the court to stay any alternative dispute resolution that had already been ordered; (4) established procedures for the Desmond plaintiffs to opt out of any class certified by the federal court in order to pursue individual actions. Id. at 1053-54. **Desmond v. BankAmerica Corp**., 263 F.3d 795, 798-201 (8th Cir. 2001)  As noted by our beloved, recently departed ,and longtime U.S. District Judge Nangle in **BankAmerica Corp. Securities Litigation**, 95 F.Supp.2d 1044,1049, 1051 (E.D. Mo. 2000)(emphasis supplied).

The federal securities laws clearly create private rights of action at equity or at law to enforce liabilities or duties imposed under those statutes. 15 U.S.C. §§ 77v(a), 78r(a). In 1995, Congress passed the Private Securities Litigation Reform Act (PSLRA) to correct abusive practices in the prosecution of securities law class actions. H.R. Conf. Rep. No. 104-369, at 32-35 (1995). The passage of the PSLRA created new federal rights for certain plaintiffs in securities class action suits.  Prior to the passage of the PSLRA, the first plaintiff to file suit was typically selected to serve as class representative. *Id.* at 33. This "race to the courthouse" mentality resulted in class actions controlled not by real plaintiffs with a substantial interest in the case but by professional plaintiffs and their attorneys. *Id.* at 32-33. **To curb the use of strike suits by such plaintiffs and their attorneys, the PSLRA provides that the most adequate plaintiffs, those with the largest financial interest in the relief sought by the class, shall be appointed lead plaintiffs. 15 U.S.C. §§ 77z-1(a)(3)(B), 78u-4(a)(3)(B).** Plaintiffs seeking to be lead plaintiff must certify that they did not purchase the security at the direction of counsel or in order to participate in any private action arising under the securities laws. 15 U.S.C. §§ 77z-1(a)(2)(A)(ii), 78u4(a)(2)(A)(ii). Further, no person may serve as lead plaintiff in more than five securities class actions in any three-year period unless the court permits otherwise. 15 U.S.C. §§ 77z1(a)(3)(B)(vi), 78u-4(a)(3)(B)(vi). Finally, the plaintiff selected as most adequate plaintiff has the right to select class counsel subject to the approval of the court. 15 U.S.C. §§ 77z1(a)(3)(B)(v), 78u-4(a)(3)(B)(v).      Clearly, the PSLRA creates rights in plaintiffs possessing the greatest financial stake in the litigation. They have the right to be appointed lead plaintiffs, to control the course of the class action litigation, and to select class counsel of their choice. This federal right cannot be given its intended scope if competing state court plaintiffs, representing a significantly smaller number of shares, can institute premature settlement negotiations which threaten the orderly conduct of the federal case and which could result in the release of the federal claims.[5]

**Piper** is inapposite. There our Eighth Circuit held that an unwilling member of a class

could not be compelled to litigate its claims and sustained the motion to compel NASD

litigation by a customer, this is contrary to the PSLRA, SLUSA, prior court decisions and

the  SEC's own directives. **Nielsen v. Piper, Jaffray, Hopwood,** 66 F.3d 145, 148-150

(7th Cir. 1995)


The only question is whether amended NASD rule 12(d) was in effect at the time relevant to this dispute. By statute, proposed rules from national securities exchanges and registered securities associations, such as NASD, are effective upon SEC approval. 15 U.S.C. Sec. 78s(b)(2). When it adopted the amended rule on October 28, 1992, the SEC stated that it would apply to "all open arbitrations and to all arbitration filings made on or after" the date of approval. The SEC did not define the term "open arbitration," but clearly this refers to arbitrations which were in progress before an arbitration panel at the

time the SEC approved the rule. Although an arbitration was not yet in progress here, the phrase "arbitration filings made on or after that date" is pertinent. Filing a motion with the district court requesting it to compel arbitration is not the same thing as filing a request for arbitration before the appropriate arbitral forum. When the district court granted PJH's motion to compel arbitration on August 30, 1993, the next step would be to submit the matter to the NASD--that is, make an "arbitration filing." And since any such filing here would occur well after October 28, 1992--the date the SEC approved the NASD rule--it would occur after the effective date of the amended rule and thus would be barred. Hence, we express no opinion as to the magistrate judge's holding that amended Rule 12(d) was to apply retroactively (because PJH did not raise this argument in its brief to this court), but instead conclude that the rule was in effect at the point PJH would have made an arbitration filing, which is a sufficient basis to say that it prohibited PJH from seeking arbitration of Kostantacos' claims.PJH raises several arguments against our conclusion that its own contract prohibited arbitration; but since most of them are based on mere snippets of the parties' agreement rather than a fair reading of the agreement as a whole we can be brief in our disposition of them. Typical of these is PJH's first argument that since the arbitration clause requires arbitration "to the fullest extent provided by law," this requires arbitration of all of Kostantacos' claim regardless of the amended rules. But the extent of the "law" of arbitration was cut back by the SEC when it pronounced that claims which had been previously filed as a class action or were encompassed by a class action were now ineligible for arbitration.

In other words, in adopting these rules the SEC placed these types of claims outside the reach of otherwise enforceable arbitration agreements. [3] PJH specifically agreed that its right to arbitrate would be delineated by the law of arbitration in effect at the time arbitration was sought. Moreover, PJH also agreed in Paragraph 9 that the agreement would incorporate all intervening statutes and regulations that affected or were inconsistent with provisions in the parties' agreement. The SEC changed the law so that JH's arbitration agreement could no longer be enforced against Kostantacos. Thus, pursuant to its own agreement, PJH could not pursue arbitration. This conclusion disposes of the bulk of PJH's remaining arguments. Yet one does deserve our attention. We find it buried in a footnote in PJH's initial brief. PJH points out that the district court denied Kostantacos' motion for class certification. Since the SEC's new rule does not prohibit arbitration against a member of a class action where class certification has been denied, see NASD Rule 12(d)(3)(A), PJH suggests that arbitration of Kostantacos' claim was appropriate. We disagree. Although the district court did not say why it denied the motion for class certification, we can only assume that it was because of its previous order compelling arbitration, which prevented Kostantacos' participation in the purported class. See Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 n. 5 (11th Cir.), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1987) (securities purchasers whose claims are subject to arbitration are not to be considered members of the class); 3B Moore's Federal Practice p 23.04 at 23-106 to 23107 (2d ed. 1995) (to have standing to represent the class the plaintiff-representative must be a member of the class).

However, by application of the new rule and the language of the parties' agreement, the order compelling arbitration should never have been granted in the first place. Thus, PJH

cannot bootstrap the district court's order denying certification as a means to avoid a clear-cut application of the SEC's rule which was incorporated into the parties' agreement and which was in full force at the time the district court ordered the matter to arbitration. Should the district court, in ruling on Kostantacos' renewed motion for class certification, reaffirm its initial determination to deny class certification--for example, because of lack of numerosity or failure to demonstrate the superiority of a class action--then PJH may rely upon that ruling and take advantage of the exception contained within the NASD's rule. Until then, however, PJH must live with the district court's decision to vacate its initial order.


 The applicable SEC rules prohibit "members from attempting to enforce arbitration contracts with customers who are members of a class or putative class unless the customer has clearly opted out or otherwise been excluded by a Court from the class action…Customers may pursue in… arbitration claims that otherwise be in included in a court litigated class action by removing their individual claims from the class action. Exchange Act Release No 34- 31097, 57 Fed. Reg. 40235 at 40236. Accordingly, neither member firms or their associated persons may use an existing arbitration agreement to compel a customer to arbitrate a claim that is encompassed by a class action. 57 Fed. Reg. 52659 at 52660.The goals defendants counsel seeks to accomplish defeats the purpose of the PSLRA and the SLUSA which they expressly invoked in removing the McCrary matter from St. Louis City Court. By not agreeing to stay the arbitration and by opposing Mr. Thompson's Motion to Dismiss the FINRA action;  Stifel, sub rosa, seek to preclude by collateral estopped or res judicata, not only the arbitrability of Mr. Thompson's case, but the substantive allegations and allegations in this matter. See Allen v. McCurry, 449 U.S. 90 (1980), Coffey v Dean Witter Reynolds, 961 F.2d 922 (10th Cir. 1992).   The claims made to the FINRA Arbitration Panel were then and remain today to be counterfactual and inapposite.  Defendants Stifel's only accomplishment in

the FINRA Arbitration was to produce Mr. Thompson's account statements which he already possessed. Despite the representations in Exhibit 1 that all the documents would be produced, counsel for Defendant Stifel insists on redactions and confidentiality of the Exception Reports, however, not one additional document has ever been produced.  The claim that over 1700 documents were produced at great expense is mirrored by the great expense that Mr. Thompson bore in producing not only those same account statements, but years of account statements dating back to 2003 from A.G. Edwards. The fact that Mr. Thompson claimed expedited consideration for his case is converse to the fact that Stifel refused to arbitrate same within the one (1) year period required.   Now Plaintiffs are forced to ask this Court for the drastic remedy of an injunction, and schedule a preliminary injunction hearing. This Court cannot be deprived of jurisdiction by a FINRA Panel acting in violation of express SEC rules and led by a rogue chairperson. Mr. Keith D. Patten while a member of the Missouri Bar, has  not actually practiced law for many years, owns a used book shop, and is dependent on FINRA fees as he is no longer a qualified  AAA arbitrator At this point Mr. Patten is so unqualified and prejudiced to the point where the Federal Arbitration Act and the FINRA rules compel his disqualification. Class actions and putative class actions may not be arbitrated. See Hazen,  Sec.15.1[11] No Arbitration for Class Actions, Treatise on the Laws of Securities Litigation, Vol.3 pp 378-380 (4th Ed.) (West Group 2002).   In memory of Burton Gayle, founding partner of Greensfelder and his close friend, my father Samuel Goldblatt, Plaintiffs waive any sanctions under Fed R. Civ. Pro Rule 11  due to multiple actions necessitated by what are arguably frivolous contentions and are a waste of precious judicial resources of this Honorable Court.

Respectfully submitted to this Honorable Court this 29th day of April 2010 under penalty of perjury.


*/s/L. Steven Goldblatt*

L. Steven Goldblatt EDMO 68327

Goldblatt Law Firm

8000 Bonhomme Suite 214

St. Louis, MO 63105

Tel: (314)-288-8455

Fax: (314)-569-4010

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was served on the following by operation of the Court's electronic CM/ECF filing system on this 5th day of April , 2010 to: Lisa Neilson Esq. Greensfelder, Hemker & Gale, P.C.10 South Broadway, Ste. 2000,St. Louis, MO 63102

nge Act, 15 U.S.C. 78j(b) and SEC  Rule 10-b-5, and common law duties of Defendants under Missouri and Illinois law. These claims are subject to the Private Securities Class Action Litigation Reform Act. 15 U.S.C. Sec. 78u-4
.

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC. .This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

3. Supplemental Jurisdiction is invoked under 28 U.S.C. Sec 1366 as the  common law claims  asserted herein arise from the same common nucleus of operative fact alleged with regard to the federal securities laws claims.

4.. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

## II. PARTIES

2. Plaintiff, Kenneth C. Thompson, is the Trustee of the under a Deed of Trust Dated March 27, 1992 and is expressly authorized to bring this action on behalf of the trust. Mr. Thompson has maintained an account on behalf of the trust from December 1, 2005 through January 2009, bearing the account number EV06 3631-0250 with respondent

Stifel.  Mr. Thompson has also maintained an IRA account at respondent Stifel  from December 1, 2005 through January 2009 bearing the account number EV06 3759-4200.

3. Plaintiff Robert McCrary was also

3. Neal Harrison was a registered representative for Stifel Nicolaus from account inception until his abrupt termination from the firm for cause on or about October 1, 2008.  Harrison was terminated due to numerous customer complaints regarding serious violations of the SRO, state and federal securities laws in his handling of customer accounts.  Mr. Harrison throughout his representation of Ken Thompson concealed his pathological gambling addiction which created tremendous cash requirements and provided him with the motive, means and opportunity to exploit Stifel customers including Ken Thompson.

4. Mr. Harrison is currently the subject to an enforcement action to debar him from the securities industry initiated by the State of Illinois Secretary of State Securities Department. **In the matter of Neal Rolla Harrison**, Illinois Secretary of State Securities Division Case Number 0700156. In October 2005 Harrison was dismissed from his employment with A.G. Edwards when Edwards became aware that Harrison was soliciting and obtaining personal loans from clients. Edwards terminated Harrison for

cause stating in his Form U-5 that he failed to follow firm policies.

5. At that time Harrison suppressed and concealed the true nature of his termination from AG Edwards from Mr. Thompson.  Instead, Harrison misrepresented his involuntary termination to Mr. Thompson and solicited Ken Thompson to continue as his registered representative and transfer his securities accounts to Stifel because he was changing firms "to pursue better business opportunities" and that he would be able to better service Mr. Thompson in his new role as broker with no supervisory duties. Relying on these misrepresentations, Mr. Thompson transferred his accounts from AG Edwards to Stifel at its Edwardsville, Illinois branch office where Harrison continued to serve as registered representative.  On or about June 2003, Harrison had solicited and obtained a personal loan from a customer identified as "P.S." in the amount of approximately $9000 again in February 2006 while employed by Stifel; Harrison solicited an additional personal loan in the amount of $7000 from that same customer.

6. Roger Compton was the branch manager at Stifel office in Edwardsville, Illinois located at 110 Rottingham Court, Edwardsville, Illinois and was Mr. Harrison's supervisor at that location in 2007 and 2008. As Mr. Harrison's supervisor, Mr. Compton had a duty under NASD rules, SEC rules, firm policy and procedures, including Stifel's operations and compliance manuals and common law duty to timely, adequately and effectively supervise Mr. Harrison and protect Stifel's customers from such misconduct.

7. On or about October 1, 2008 Compton assumed direct responsibility for the accounts and failed to disclose the reason for Harrison's termination.

8.  Respondent Stifel Nicolaus is and was a member of the New York Stock Exchange, the Chicago and American Stock Exchanges as well as the National Association of Security Dealers. Stifel's headquarters is located at 501 N Broadway St. Louis, Missouri.

9. Stifel in its promotional material, brochures and currently on its website holds itself out to the public as a broker of the highest quality with a distinguished history.  On its current website Stifel asserts the following:

**Stifel Nicolaus - About Us - Statement of Commitment**
**Company Description**
Stifel Financial Corp. is a full-service regional brokerage and investment banking firm, established in 1890 and based in St. Louis, Missouri. The Company provides securities brokerage, investment banking, trading, investment advisory, and related financial services through its wholly owned subsidiaries, primarily Stifel, Nicolaus & Company, Incorporated, to individual investors, professional money managers, businesses, and municipalities.
**Statement of Commitment**
**To our clients -** individual, institutional, corporate, and municipal, our commitment is to listen and consistently deliver innovative financial solutions. Putting the welfare of clients and community first, we strive to be the advisor of choice in the industry. Pursuit of excellence and a desire to exceed clients' expectations are the values that empower our Company to achieve this status.
**To our Associates -** current and future, our commitment is to provide an entrepreneurial environment that encourages unconfined, long-term thinking. We seek to reward hard-working team players that devote their energy and attention to client needs. At work, at home, and in their community, we seek to be their firm of choice.
**To our Shareholders -** small and large, our commitment is to create value and maximize your return on investment through all market cycles. To achieve this, we remain true to our mission. The mission is clear: Advisor of Choice, Firm of Choice, Investment of Choice.
**Firm of Choice**
Recognition as the advisor of choice by clients is Stifel's primary objective. Achievement of this objective requires that Stifel be acknowledged as the firm of choice for top-quality financial professionals. While maintaining a respect for its legacy, Stifel has successfully integrated a 108-year business tradition with a modern, entrepreneurial work force.
Stifel has succeeded in attracting and retaining a wealth of talented associates who prefer a culture which rewards team-oriented, creative thinking. As the firm of choice for the best professionals in our industry, Stifel nurtures a culture which values the diversity of its work force and encourages independent thinking in meeting clients' goals. Stifel makes available to its associates an array of services, products, and support uncommon in a regional financial services firm.
**Investment of Choice**

Stifel's overall strategy for creating shareholder value relies upon two precepts. The first is based upon fostering an entrepreneurial environment where client interests are paramount and where quality ideas and innovative recommendations flow freely. Talented associates who recognize the value of this culture will make Stifel their firm of choice. The second precept relies on team-oriented associates understanding client needs and providing quality, client-driven solutions. Clients who recognize the value of this advice will make Stifel their advisor of choice. The recognition of these values by our clients and by our associates will, in turn, result in increased value for our shareholders, making Stifel common stock the investment of choice.

**Advisor of Choice**

Without exception, the clients' success must precede the success of the Company or any individual within the Company. Absent this obligation, any short-term gain portends a long-term failure. For more than a century, Stifel has contributed to the success of our clients by building upon a foundation of trust and understanding. Stifel advisors develop solutions to help individuals meet personal financial goals, to help businesses raise capital, and to enable communities to offer a higher quality of life.

10. Mr. Harrison is currently the subject to an enforcement action to debar him from the

securities industry initiated by the State of Illinois Secretary of State Securities Division.

**In The Matter of Neal Rolla Harrison**, Case Number 0700156.

As on or about June 2003, Harrison had solicited and obtained a personal loan from a

customer identified as "P.S." while at Edwards, in the amount of approximately $9000.

Yet it is obvious that from the beginning Stifel instituted no special supervision, if any as

to Harrison. In February 2006, shortly after retention by Stifel; Harrison solicited an

additional personal loan in the amount of $7000 from that same customer.

12. Stifel was aware or should have been aware based on the U-5 Termination Notice, in

which A.G. Edwards stated that Harrison had been dismissed for failure to follow firm

policies that Harrison presented a serious threat to Stifel's customers.  Nonetheless,

during the time the time that Harrison was employed by Stifel, Harrison continued to

solicit and obtain personal loans from clients and was not dismissed until October 2008.

Indeed, from the documented history of Harrison's trading in Mr. Thomson's accounts,

and the likely exception reports generated when Harrison's trading reached an annual

turnover ratio in excess of 70 there was no supervision of Mr. Harrison, much less,

special supervisory procedures instituted in light of his prior termination for cause and

Form U-5 from Edwards.


13. On or about May 29, 2007 Harrison offered and sold his client identified as "C.B." an

Illinois resident an investment plan which Harrison represented that he would invest

"CB's" funds totaling $24,000 in commodities.  Rather than investing "C.B.'s" funds in

commodities Harrison on or about May 30, 2007 deposited "C.B.'s" funds in his own

personal bank account and used his customer funds for his own personal use including

gambling activities.


14. On or about June 18, 2007 and July 9, 2007 Harrison offered and sold to his client

"RM"  an investment plan for a total investment of $44,800 instead of investing "R.M.'s"

funds as promised Harrison on June 19, 2007 deposited "R.M.'s" funds in his own

personal bank account and used such funds for personal uses including gambling.


15. On or about April 7 2008 Harrison offered and sold his client "E.D." and investment

plan for a total investment of $9724 instead of investing "E.D.'s" funds as promised

Harrison deposited "E.D.'s" funds in his own personal bank account and used such funds

for personal uses including gambling.


16. Given Mr. Harrison U-5 termination for cause from A.G. Edwards, any argument that

these activities were "selling away" and Stifel could not have detected same are implausible. If Mr. Harrison was appropriately hired, and given the U-5 termination for cause such retention was reckless and contrary to industry practice, he should have been subject to extraordinary supervision including monitoring of all of his banking accounts, emails, telephone records, and audits and follow up calls to his clients particularly those with high net worth and excessive and trading activities, such as Mr. Thompson's accounts.

17. It appears that the only plausible reason for Mr. Harrison's registration with Stifel and continued retention was his book of business and the large amounts of commissions he generated for Stifel, Compton, and Harrison. Stifel registered representatives average $400,000.00  a year in commissions and fees. It appears that as long as Harrison met his quota, Stifel ignored the means and methods by which Harrison operated for three years.

18.  Stifel relied on commissions generated by registered representatives such as Neil Harrison and branches such as the Edwardsville Branch managed by Compton for the vast majority of its revenue during 2007 and the preceding 10 years.  As noted on an article posted on Registered Representative in early 2008:

Stifel's Profits Healthy and Forecasts Bright

In the past decade, Kruszewski, together with his core executive team — Jim Zemlyak, the CFO, and Scott

McCuaig, the president and co-COO, both also former Baird executives to whom he attributes much of the firm's success — has turned the once-beleaguered regional into a tiny juggernaut. Net revenues have grown at a compound annual-growth rate of 20.5 percent since 1997, when Kruszewski came aboard. But success has accelerated the most since 2000, when net revenues were a mere $177 million. This year, KBW analyst Lauren Smith expects nearly $800 million in revenue, a 75 percent increase over 2006. Since 2001, core earnings per share have grown at a CAGR of 72 percent, and more than doubled between 2003 and 2006 to $2.85 per share. Additionally, core earnings were up nearly 50 percent through the first half of 2007 compared to the same time last year, according to Smith. "A firm that's doing that well has no reason to sell," says Mike Flanagan, an independent analyst with Securities Industry Analytics.

Today, Stifel Financial consists of four main groups: the private client group, which includes Stifel Nicolaus and Century Securities Associates, its independent contractor brand; the equity capital markets group (corporate finance, research, equity trading, institutional sales and trading); fixed income capital markets (public finance, institutional sales, underwriting and trading), and the bank it acquired in April and has renamed Stifel Bank & Trust.

The Power Source

The engine driving the growth is the private client group, which includes the 956 Stifel Nicolaus advisors (including 450 from Ryan Beck) in 152 branches, and 194 independent contractor reps under the Century Securities Associates brand. Together, these operations contributed 55 percent of the firm's total revenues in the first half of this year, a figure that was closer to 75 percent before the addition of Legg's capital markets group. Full-year results from the addition of Ryan Beck reps will likely swing the balance back to

retail, according to analysts. Since 1998, Kruszewski's first full year, the CAGR of revenues in the private client group have been 17 percent. This year, revenues are expected to reach $408 million, a 76-percent increase over 2006, with the help of Ryan Beck's advisors, and the $22.5 billion they add to the total client-asset pie (now $58 billion).

The capital markets group of Legg Mason (which remains in Baltimore) was considered among the best in the business, particularly its research department. In The Wall Street Journal's 2007 analyst survey, Stifel

ranked 6th out of 85 research firms, with seven analysts getting specific recognition for their talents. "Our analysts are being quoted in the press, on financial news shows — it's been phenomenal for the business," says Bob Stanczak, a branch manager in Ann Arbor. Still, a household name it's not. The firm has even exhibited a sense of humor about its obscurity: A recent ad read, "It's pronounced (Stee-fuhl)."

Besides award-winning research and a strong middle- market investment bank, Stifel also has a bank, which it bought in April. "Most regional firms concluded correctly that they needed to offer liability-type products to clients," says Kruszewski. In its first four quarters of operation, Stifel Bank & Trust, formerly First Services Financial Company, generated $1.1 million in net revenues, and $274,000 in operating profit, just a sign of the kind of rapid growth analysts expect in the near future.

Is Kruszewski trying to emulate the wirehouses?  "Absolutely not. What we want is to be an alternative to the conglomerates," he says, one he hopes brokers at some of the regional firms that have been gobbled up — Piper Jeffrey, A.G. Edwards, Advest, to name a few — will take notice of, if and when they become disillusioned with their big New York parents.

19. Stifel Nicolaus has been subject to many SRO, SEC and state regulatory actions which reflect continuing failure to supervise its branches as well as its registered representatives:

    a.   In March 2008, Stifel was subject to a lawsuit alleging state securities laws

        violations by the Missouri Attorney General. Stifel Nicolaus and its registered

representative are the subject of a Petition for Injunction Other Relief in a case commenced by the Missouri Attorney General in the Circuit Court of Franklin County, Missouri Case No. 09ABCC0075 in which Stifel's retail agents are alleged to have made untrue statements and omissions to their customers amounting to deception, misrepresentation and deceit in violation of the Missouri Securities Act and the Missouri Merchandising Practices Act with respect to the sale of auction rate securities.  Stifel has attempted to remove this case to the United States District Court for the Eastern District of Missouri Case No 4:09-cv-00560. Despite the fact that state blue sky regulations, such as the Missouri Securities Act are explicitly not preempted by Federal law, 15 U.S.C. Sec. 78bb and applicable United States Supreme Court decision, Such removal to U. S. District Court of The State of Missouri's attempt under the Missouri Securities Act to compel Stifel to follow the course of every other national brokerage firm and repurchase Auction rate securities which were known to be toxic. These securities were marketed to many retired individuals and the elderly as cash-alternative, which were riskless and safe to the elderly who depend on these investments for basic living expenses. From the State of Missouri's allegations, Stifel registered representatives persisted in a pattern of untrue, misleading, and deceptive sales practices  and  Stifel's failure to follow custom and practice and repurchase the auction rate securities is  consistent with its ongoing litigation strategy to delay, if not defeat, even meritorious customer claims. The Motion of the State of Missouri remand is pending.

(b) In April 2001, NASDR censured and fined Stifel, its Clayton, Mo, branch

manager William J. Lasko for the sale of over $7-million in Class B shares to 42
individuals in violation of NASD rules. .


b.   In the last ten (10) years Stifel agents and branch managers have been subject to
several United States Securities Exchange Commission Enforcement actions.

    1.   **SEC v. Regald B. Smith**, United States District Court for the Eastern
District of Kentucky No 7:00CV 358 Stifel branch manager Smith entered
into a consent judgment he had misappropriated over 3.8 million dollars of
client funds and   Stifel failed to discover  and stop the fraud..

    2. **SEC v David Knall** , United States District Court for the Southern District
of Indiana No 1:07CV15 62 Stifel's registered representative used
material inside information to engage in violation of Section 14, (e) of the
Securities Exchange Act by means of taking a short position in common
stock in a publicly traded security after Knall covered his short position on
June 16, 2004 in his personal account.  At the time Mr. Knall was a
Managing Director and Financial Advisor at Stifel.  During the same time
period he was also registered with Mc Donald Investment Inc..


20.  In the Indiana Secretary of State Securities Division Case No 01-0174 the State of
Indiana alleged that Stifel failed to reasonably supervise its agents, engaged in dishonest
and unethical business practices and made unsuitable trades and recommendations.


21. In NASDR No C040110012 Stifel's Clayton Missouri branch manager William J.

Lasko and registered representative Michael G. Grimes were alleged to have failed to supervise and made unsuitable sales of Class B mutual funds shares of over 7 million dollars to forty-four (44) customers.  Ultimately, Stifel entered into an AWC in which Stifel, Grimes and Lasko agreed to make restitution of $225,000.  Stifel was censured, fined $41,000 and Stifel was ordered to provide a written report containing specific recommendations to revise the firms complains and written supervisory procedure.

20. In sum, since the NASD proceedings against Stifel, Lasko and Grimes, Stifel and its registered representatives have made fourteen (14) required reports of regulatory violations to state, federal and SRO regulators, many of which involve failure to supervise.  Since June 12, 2000, Stifel has reported 60 arbitration awards to NASD and now FINRA.  Some of the most notable awards include **Tony Marshall v Stifel** , NASD Case No. 06-02174 involving allegations of among other claims fraud, negligence, failure to supervise and unsuitability. In **Phillip Rein v Stifel** , FINRA Dispute Resolution No 07-01495 involving allegation of among other claims fraud, negligence, failure to supervise and unsuitability a St.Louis FINRA Panel awarded Mr. Rein $220,944 in compensatory damages.  In **Dagmar E Bizzoni v Stifel**, NASD Case No 03-00495 involving allegation of among other claims fraud, negligence, failure to supervise, churning and unsuitability a St. Louis Arbitration Panel awarded complainant $123,760 in compensatory damages.  In the matter of Miller v Stifel etal, involving allegations of among other claims, fraud, negligence, failure to supervise and unsuitability a St. Louis Arbitration Panel Awarded claimants $30,000 in compensatory damages and $30,000 punitive damages.   In NASD Case No. 01-02950 involving allegation of among other

28

claims fraud, negligence, failure to supervise and unsuitability, an Arbitration Panel in Louisville Kentucky awarded claimant $2,020,392 in compensatory damages and $117,500 in attorney fees.  It should be noted that the reported awards are a minority of those NASD and FINRA claims brought against Stifel and in many of the reported awards the amount awarded is substantially less than the amount claimed or Stifel has emerged victorious.  While each arbitration claim stands on its own facts, since 2001 Stifel's management including Stifel's President, Ronald J. Kruszewski, Jim Zemlyak Chief Financial Officer and Scott McCuaig President and Co-COO, have turned Stifel from a regional brokerage into a money making machine.

21.  According to an article published in Registered Representative Magazine "Success as accelerated the most since 2000o, when net revenues were $177 million to almost $800 million in revenue. According to Registered Representative "The engine driving the growth is the private client group, which includes the 956 Stifel advisors (including 450 from Ryan Beck) in 152 branches and 194 independent contractor representatives under the Century Securities Associate brand going on.  Together these operations contributed 55% of the firms total revenues in the first half of this year (2007), a figure that was closer to 75% before the addition of LEGG's capital markets group.  Since 1998,  the CAGR of revenues in the private client group have been 17%."  Stifel has certainly not stinted its expenditures on its award winning research analyst in the Wall Street Journal's Analyst Survey,  Stifel ranked 6th out of 85 research firms with 7 analyst getting specific recognition for their talents.  As reported in the November 1, 2002 online edition of Registered Representative, Stifel has attempted during this time period to move to a web

based broker auditing software design to cut down on paperwork and raise red flags for branch managers when inappropriate trades are entered or errors made.

22. On or about November 1, 2002 Stifel implemented a software product designed by Protegent. According to Registered Representative "The software lets branch managers run compliance reports on their brokers as well as exception reports.  It also uncovers under diversified client portfolios and portfolios that don't match a client's risk tolerance." Also, according to the same article, Protogent "archives trade reports as well as comments and notes by managers. It can be used on a branch, regional or national level."

23. Mr.  Thompson was born on April 10, 1938 and later attended Collinsville High School, as well as Southern Illinois University - Carbondale graduating with a Bachelor of Science Degree in Marketing.  He attended the State Farm training school in Bloomington, Illinois and served in various entry level positions with that firm. He then took a position with Farmers Insurance which had just entered the market in Southern Illinois and as Farmer's District Agent built that companies insurance business from scratch until it had achieved a significant share of the market. As a result of his marketing and tireless efforts in that market his salary had increased from $30,000 a year to as much as $360,000.00. He raised three sons, Jeffrey, Scott and Doug. In addition to his insurance business in 1975, Mr. Thompson bough 68 acres of land in Marine, Ill and  63 acres in Highland, Ill which he actively farmed every weekend. In 1977 He built a home on the Highland Farm where he still lives with his wife Bernadette.

24. Due to his lifetime work building Farmer's District Office in the Belleville area from scratch to a major competitor, he had accumulated a substantial net worth. However, while extremely knowledgeable about the insurance business, products, and marketing, including annuities, Mr. Thompson had absolutely no knowledge or experience in the securities industry, securities products, or compliance requirements. Accordingly, after he met Mr. Harrison he placed complete trust and confidence in him, Throughout the seven year time period Mr. Harrison was the registered representative for Mr. Thompson,  Beginning in 2001, at A. G. Edwards and continuing at Stifel beginning in October, 2005 after Mr. Thompson transferred his accounts to Stifel following  Mr. Harrison termination for cause for :failure to follow firm policy; Harrison consummated every exchange trade without approval from Mr. Thompson and without written discretionary authority bought and sold securities  bought and sold millions of dollars of securities from Mr., Thompson generating hundreds of thousands of dollars in commissions from this retiree. Throughout the 7 year relationship Harrison controlled the account, making unauthorized buys and sales without any consultation or communication with Mr. Thompson. This is a violation per se of NASD rules, SEC Rules too numerous to be cited here as well as Stifel's own policies. Thompson did not execute any document vesting Harrison with "discretionary authority" at any time either at Edwards of Stifel.

25. As of March 28, 2002, the Trust account at Edwards was valued by Edwards at $1,027,794.22. As of that same date, the IRA account at Edwards was valued by Edward at $641,225.58. Other than his working farm to which he devoted much work in

retirement daily, Mr. Thompson has placed his entire net worth exclusive of the farm and house in the hands of Harrison: $1,669,019.80.

26. Harrison engaged in a course of unauthorized trading and churning of the account. While Mr. Thompson did receive confirmations of the trades and monthly statements he had no idea that his prior authorization was required. Accordingly, after he met Mr. Harrison in 2001 when Harrison was at AG Edwards, again Mr. Thompson placed complete and total trust and confidence in Mr. Harrison at Stifel. Throughout the time period Mr. Harrison was the registered representative for Mr. Thompson, Mr. Harrison without written discretionary authority bought and sold securities without prior authorization from Mr., Thompson and, in fact, controlled the account, Harrison engaged in a course of unauthorized trading and churning of the account.  During Harrison's entire 4 year tenure with Stifel, he personally met with Mr. Thompson only on 5 occasion, perhaps 3 times in  2008 alone despite setting up and cancelling 15 meetings during 2008. Perhaps, Harrison initiated 3 phone calls in 2008. It is believed that the cancelled meetings were actually excuses for Harrison to engage in gambling excursions and leave the Edwardsville branch during business hours.

24. Stifel, its branch manger, its compliance officers and other control persons under Security and Exchange Act Section  who reviewed or should have reviewed all of the Protogent software compliance reports which are  believed to have generated exceptions, red flags, weekly and monthly  based upon Harrisons  excessive trading during 2007 and 2008 should have taken action. Beginning in August, 2007, Harrison's excessive concentration in equities and preferred shares in the financial sector contrary to Stifel's

32

own research reports and industry recognition of the serious liquidity risk, credit risk, and insolvency risk of banks, brokerages and government backed entities such as FNMA and SLMA. Despite the trillions of dollars of  exposure of financial institutions   such as Bank of America, Bear Stearns, and quasi-government entities such as FNMA, SLMA  to mortgages and loans, collateralized debt obligations secured by home mortgage loans when home   prices were plummeting; collateralized loan obligations secured by credit card debt when defaults were rising; and the resulting exploding exposure of banks and brokerages and on credit derivative swaps;  Harrison engaged in grossly excessive trading  and  grossly excessive  concentration from 9-30-2007 through 9-30-2008 in the equities and preferred shares in the financial sector and Quasi- Government entities such as FHLMC, FNMA, and SLMA in both Mr. Thompson's IRA and Trust Account.

25. If not before, at least as of September 30, 2007, the Protogent based Stifel compliance reports and exceptions should have detected, and it is believed did detect this account activity and Stifel through its Edwardsville branch manager Compton and other Stifel control persons   actually knew of Harrison's excessive trading and reckless concentration in the financial sector in Mr. Thompson's account. With Stifel's compliance system, personal oversight and computer software, Stifel should have

terminated Harrison, alerted Mr. Thompson and investigated Harrison's other accounts, bank accounts, and other activities with Stifel customers. Stifel did nothing. It is believed that Stifle's Protogent based on line and real time compliance software generates numerous exception reports and that Stifel's custom and practice is simply to ignore them.

26. Harrison other illegal and fraudulent activities included borrowing money from other Stifel clients to finance Harrison's gambling addiction, Harrison was absent from the office frequently, and was gambling not only at the boats, but with Mr. Thompson's life savings and loans received from other retired customers.

27. When Harrison's fraud and gross imprioprieties were belatedly discovered by Stifel in which event Stifel and Branch Manger Compton were grossly negligent, or Stifel with knowledge of same finally decided to pull the plug on the Harrison cash machine due to anticipated regulatory action; Harrison was finally terminated for cause. Stifel Edwardsville, Illinois Branch Manager Roger Compton met with Mr. Thompson in October, 2008. Compton concealed the true circumstances of Harrison termination. When questioned by Mr. Thompson why Compton did not examine Mr. Harrison's trading activity in his accounts, Compton explained he was "too busy" to supervise the registered representatives in his branch, failing to disclose that Compton received every week and month Protogent exception reports detailing exceptions, the  red flags that could have or did reveal  to Compton these egregious violations. Then as the market collapsed, the TARP bailout ensued and every diligent registered representative made massive, even

heroic efforts in an economic crisis and stock market collapse unprecedented since 1929 to mitigate client losses, Compton who has assumed direct control of Mr. Thompson's accounts did very little, if nothing meaningful to attempt to reposition Mr. Thompson's portfolio. If Compton failed to review these exception reports for Harrison he is clearly negligent. If Compton knew of these exception reports and failed to follow up, Compton, at the very least recklessly exposed Mr. Thompson and Stifel to tremendous losses.

28. When Compton took direct control of Mr. Thompson's accounts on or about October 1, 2008, his failure to disclose the true circumstances of Harrison's termination and take some action to mitigate these losses, aside from one token mutual fund transaction and the sell off the worthless Lehman positions, Compton's acts and omissions amount to more than failure to honor just and equitable principles of the industry and fair dealing. Given Mr. Thompson's age, investment experience, reliance on the accounts for necessary income, both Harrison and Compton acts and omissions reflect gambling, not only with Mr. Thompson's portfolio and security in retirement, but with the reputation and financial condition of Stifel. It appears that the only plausible reason for Mr. Harrison's registration with Stifel and continued retention was his book of business and the large amounts of commissions he generated for Stifel, Compton, and Harrison.

27. The following transactions took place in Mr. Thompson's IRA and Trust accounts in the 4th quarter of 2007 and in 2008  which reflect churning, unsuitability, failure to supervise, fraud, and negligence and other ongoing violations of NASD rules, SEC regulations, Stifel's' own policies  as well as other claims set forth below. Turnover ratios

in January and February 2008 were astronomical over 400 in February, 2008 alone.

### IRA

| | | | | | | |
|---|---|---|---|---|---|---|
| BUY | 11-15-07 | PURCHASE | Wachovia Capital Trust | PFD 7.83% | 2000 SH | $50,000.00 |
| BUY | 12-25-07 | | CitiGroup TA | B/E 6% | 1500 SH | $28,225.00 |
| SELL | 02-26-08 | | CitiGroup TA | | 1500 SH | $31.539.65 |
| BUY | 02-26-08 | PURCHASE | SunTrust Capital | | 1500 SH | $37,500.00 |
| BUY | 02-29-09 | PURCHASE | Colonial Banc Gr notes | 8.875% | 1000 SH | $25,000.00 |
| BUY | 07-24-08 | SELL | Allied Irish Banc PLC | | 1000 SH | $26,678.88 (167623) |
| | 07-21-08 | CASH | | | | $50,000.00 |

### TRUST

| | | | | | | |
|---|---|---|---|---|---|---|
| BUY | 11-30-07 | PURCHASE | ABN AMBN Capital | 6.08% | 1000 SH | $20,065.00 |
| BUY | 11-30-07 | PURCHASE | AE Gen NV Perpetual | | 1000 SH | $21,585.00 |
| BUY | 11-30-07 | PURCHASE | National City Capital | | 1000 SH | $19,495.00 |
| BUY | 11-30-07 | PURCHASE | Royal Bank of Scotland | | 1000 SH | $21,335.00 |
| BUY | 12-28-07 | PURCHASE | Merril Lynch Perpetual PFD | 6.375% | 1000 SH | $21,025.00 |
| BUY | 12-28-07 | PURCHASE | ING Group NV Securities | | 1000 SH | $20,850.00 |
| BUY | 12-29-07 | PURCHASE | Federal Nat'l Mtg Ass PFD | | 1000 SH | $25,855.00 |
| BUY | 12-28-07 | PURCHASE | BAC Capital Trust | 6% | 1200 SH | $24,221.00 |
| BUY | 01-30-08 | BUY | Washington Mutual | 8.25% | 60,000 SH | $61,696.00 |
| BUY | 01-15-08 | PURCHASE | Countrywide Capital | | 2000 SH | $35,034.89 |
| SELL | 02-29-08 | PURCHASE | Royal Bank of Scotland | | 1000 SH | $23,663.72 |
| SELL | 02-29-08 | PURCHASE | ING Group NV | | 1000 SH | $22,744.74 |
| SELL | 02-29-08 | PURCHASE | BAC Capital Trust | 6% | 1200 SH | $26,705.72 |
| SELL | 02-29-08 | PURCHASE | ABN AMBO Capital | | 1000 SH | $22,064.00 |
| BUY | 02-29-08 | BUY | SLM Corp | | 7000 SH | $6,125.00 |
| BUY | 02-29-08 | BUY | SLM Corp | | 3000 SH | $11,231.00 |
| 0 | | | | | | |

$11,231.00

| | | | | | | |
|---|---|---|---|---|---|---|
| BUY | 02-29-08 | SELL | Royal Bank of Scotland | | 400 SH | $3127.00 |
| BUY | 02-29-08 | SELL | Royal Bank of Scotland | | 700 SH | $5488.00 |
| BUY | 02-29-08 | SELL | Royal Bank of Scotland | | 1200 SH | $9396.00 |
| BUY | 02-29-08 | SELL | Royal Bank of Scotland | | 700 SH | $3281.00 |
| BUY | 02-29-08 | PURCHASE | Colonial Bank Corp | | 1500 SH | $37,500.00 |
| BUY | 02-29-08 | PURCHASE | KeyCorp Capital | | 60,000 SH | $60,000.00 |
| BUY | 02-29-08 | PURCHASE | Countrywide | | 2000 SH | $36,414.78 |
| SELL | 06-25-08 | PURCHASE | Countrywide | | 2000 SH | $36,414.78 |
| BUY | 06-30-08 | PURCHASE | Bearstearns | | 750 SH | $29,195.00 |
| BUY | 07-31-08 | PURCHASE | CitiGroup Capital | | 2500 SH | $45,612.00 |
| BUY | 07-24-08 | PURCHASE | National City | | 1000 SH | $16,875.00 |
| BUY | 07-28-08 | PURCHASE | Merril Lynch DEPSH | 8.625% | 1000 SH | $21,205.00 |
| BUY | 07-24-08 | PURCHASE | Lehman Bros Holdings | | 1000 SH | $18,005.00 |
| BUY | 07-18-08 | PURCHASE | National City Trust | 8% | 200 SH | $2545.00 |
| BUY | 07-18-08 | PURCHASE | Lehman Bros Holdings | 7% | 500 SH | $24,875.00 |
| BUY | 08-14-08 | SELL | Allied Irish Bank | | 2500 SH | $53,401.00 |
| SELL | 10-30-08 | PURCHASE | National City Capital | | 1200 SH | $21,906.00 |

## THE IRA ACCOUNT

29. At account inception at Stifel on transfer in of the IRA account from A.G. Edwards the Total Net Portfolio value was $600,362.33 for the IRA account on November 30, 2005. Of that amount an Equitable Life Assurance Fixed and Variable Annuity represented $270,435.15.  Hence, the remainder of the portfolio was valued at $329,927.00 The Investment Objective was listed as "Growth and Income" when Mr., Thompson recalls his investment objective for the IRA account as conservation of principal and income.

 30.**As of December 31, 2008, the IRA Total Net Portfolio value was $477,810.54. $317, 260.30 of that amount consisted of that same annuity. At the end of the 2008 the IRA portfolio exclusive of the annuity was valued at$160,550.** Hence as of December 31, 2007, in a period of 24 months there were a total of $1,068,609.60 in buys and sales exclusive of the annuity account, but including bonds and mutual funds. So in a total of 30 months Harrison churned $2,189,386 in transactions in the IRA account whose median value during the period in question exclusive of the Equitable/Axa annuity was approximately $245,000 resulting in a turnover ratio of 8.93 Given Mr. Thompson's age, dependence on the IRA account for income, the nature of the IRA account, this turnover rate in a 30 month period is grossly excessive. See for e.g. Mihara v. Dean Witter, 619 F.2d 814, 821 (9th Cir 1980) turnover ratio of 9 annually and 14 in 30 months churning:

Whether trading is excessive is a question which must be examined in light of the investment objectives of the customer. While there is no clear line of demarcation, courts and commentators have suggested that an annual turnover rate of six reflects excessive trading. See **Rolf v. Blyth, Eastman, Dillon & Company**, 424 F. Supp., at 1039. See

also Churning by Securities Dealers, 80 Harv .L.Rev. 869 (1967)**. Hecht v. Harris Upham & Company, 283 F. Supp. 417** (N.D.Cal., 1968), aff'd at 430 F.2d 1202, 1210 (9th Cir., 1970), this Court affirmed a finding of churning where an account had been turned over 8 to 11.5 times during a six-year ten-month period. In that case, 45% of the securities were held for less than six months, 67% were held for less than nine months, and 82% were held for less than a year. Under this Court's holding in Hecht, the evidence in the present case clearly supports a finding of excessive trading.

With regard to the second prerequisite, we believe that Gracis exercised sufficient control over Mihara's account in the present case to support a finding of churning. The account need not be a discretionary account whereby the broker executes each trade without the consent of the client. As the Hecht case indicates, the requisite degree of control is met when the client routinely follows the recommendations of the broker. The present case, as in Hecht, reflects a pattern of de facto control by the broker.

 The third requisite element of a 10b-5 violation scienter has also been established. The manner in which Mihara's account was handled reflects, at best, a reckless disregard for the client's investment concerns, and, at worst, an outright scheme to defraud plaintiff **Id.**

Further, despite the claim always made that exogenous market forces generated the loss, since the evil involved is the generation of excessive commissions, the fact that the customer's account increased in value does not preclude a churning claim.  **Davis v**. **Merrill Lynch**, 906 F. 2d 1206 (8th Cir. 1990).

Finally, the commonly accepted view is to award damages to diminution in portfolio losses where, as here, Harrison engaged in repeated egregious unsuitable investments. **Nesbit v. Mc Neil**, 896 F. 2d 380, 385 (9th Cir 1990); **Miley v. Oppenheimer & Co**., 637 f. 2d 318, 326 (5th Cir 1981) However, it certainly can be argued Mr. Thompson may recover addition consequential losses due to changed investment strategy during churning activity.  **Fey v. Walston & Co**., 493 F. 2d 1036 1044-1054 (7th Cir 1974); **Police Retirement System of St. Louis v. Midwest Investment Advisory Services, Inc.** 706 F. Supp (E.D.Mo 1989)

31. But the core element of proof to the churning claim is the incredible number of in and

out transaction in mutual funds, which are typically held for at least a year, if not longer.

Attached herewith and incorporated by this reference are Exhibits 1 and 2;

Mr. Kenneth C. and Bernadette C. Thompson's United States Form 1040 and Schedule C

Statements for 2007 and 2008. Each schedule reflects scores of trades in Mutual Funds

like Hartford, held for less than a year.

32. Withdrawals totaled $ 86,001.64 paid to Mr. Thompson. It is believed that the total commissions and fees generated received dwarf the amount of withdrawals on the account.

33. During this same time period, a persistent pattern of concentration of transactions at the middle and end of the month is presented which justifies the inference that Harrison was using the Thompson IRA account as a "piggy bank" to generate commissions to make up his quota or draw shortfall for each monthly period and to provide for his personal needs, gambling or otherwise.

### ALL IRA TRANSACTIONS AT STIFEL JANUARY 2006-2009

| 1-26-06 | S | 600.000 SH | 30.7500 | Alcoa | $18,199.61 |
|---------|---|------------|---------|-------|------------|
|         |   | 400.000 SH | 47.2800 | Citigroup | $18, 168.44. |
| 2-27-06 | S | 1,238.50 SH | 30.1800 | AMCAP Funds Inc Class A | $25,000.00 |
| 3-20-06 | B |            |         | Hartford Mut Fds | $55,000.00 |
| 3-21-06 | S | 100.000 SH | 4.3200  | Mylan Lab Inc |            |

| Date | B/S | Shares | Price | Security | Amount |
|---|---|---|---|---|---|
| | | 800.00  SH | 24.1300 | Dillards PFD 7.5% | |
| | | 302.049  SH | | Coca-Cola | |
| | | | | (See Exhibit A) | $55,726.00 |
| 5-10-06 | B | 1,000.000 SH | | FHLB Bonds | $30,305.00 |
| | S | 1,000.000 SH | | COMCAST Corp | $31,586.66 |
| 8-23-06 | B | 1456.664 SH | 13.7300 | Hartford Mut Fd | $20,000.00 |
| | S | 500.000 SH | 31.1500 | Tribune Co | $15,355.01 |
| | | 500.000 SH | 34.51 | Verizon | $17,020.91 |
| 9-07-06 | B | 1000.000 SH | 27.5084 | ISHARES Dow Jones US Telecom | $28,024.74 |
| | | 500.000 SH | 33.1692 | Sector SPDRTR SHS BEN INT Healthcare | $16,932.60 |
| 9-27-06 | S | 3020.896 SH | 13.7900 | Nuveen Pfd & Conv Inc Fd II | $41,261.22 |
| 11-15-06 | S | 500.000 SH | 31.0800 | Novellus Sys Inc | $15,297.23 |
| 1-29-07 | B | 1500.000 SH | 19.9500 | General Motors Corp SER GM 7.375 Pfd | $30,510.12 |
| | S | 1000.000 SH | 30.2408 | ISHARES Dow Jones US Telecom | $29,911.17 |
| 3-23-07 | B | 1500.000 SH | 11.9095 | FT Global Nat Res | $17,864.25 |
| | S | 1000.000 SH | 9.4500 | DYNEGY Inc | $9,254.51 |
| 4-19-07 | B | 43,564.860 SH | 1.0000 | CASH Management TR of America | $43,564.86. |
| | B | various SH | 1.0000 | Hartford Mut Fd | $62673.56 |
| 5-31-07 | B | 30,000 SH | | Lehman Bro PFD  6.2% | $30,005.00 |
| 10-8-07 | B | 500.000 SH | 35.7478 | Superior Energy Svc Inc | $18,238.78 |
| | S | 500.000 SH | 36.0308 | SECTOR SPDRTR SHS BEN INT Healthcare | $17,829.42 |

| Date | B/S | Shares | Price | Security | Amount |
|---|---|---|---|---|---|
| 11-1-07 | B | 2000.000 SH | 25.0000 | Wach Capital Trust PFD | $50,000.00 |
| | | 700.000 SH | 19.0500 | Myers Industries | $13,633.06 |
| | | 300.000 SH | 19.0499 | | $5840.56 |
| | | | | total purchase price of $ 19,473.62 | |
| | | 494.000 SH | 26.8500 | Reddy Ice Holdings Inc | $13,517.89 |
| | | 400.000 SH | 26.9100 | | $10,966.06 |
| | | 100.000 SH | 26.9400 | | $2,744.57 |
| | | 6.000 SH | 36.9000 | | $164.43 |
| | | | | total purchase price of $27,392.95 | |
| 12-4-07 $28,146.86 | S | 347.000 SH | | General Motors Corp SCR GM 7.35%. | |
| 12-28-07 $28,445.00 | B | 1500.000 SH | | Citigroup Capital TR IX 6% B/E | |
| 1-23-08 $22450.47 | B | 350.000 SH | 63.1199 | Alliance Data | |
| $2914.09 | S | 153.000 SH | 19.7600 | Corp Backed TR CTFS General Motors Corp | |
| $10,469.39 | | 1070.490 SH | 9.7800 | Hartford Mut Fd Inc Short Duration | |
| | | 811.855 SH | | Hartford Mut Fd Inc | $7550.25 |
| 2-13-08 | B | 150.000 SH | 25.0000 | SunTrust Capital IX 7.8 Trust PFD Securities | $37,500.00 |
| 2-29-08 $35,000.00. | B | 1000.000 SH | 35.0000 | Colonial Banc Group Inc | |
| 2-13-08 | S | 500.000 SH | 42.7116 | Superior Energy | $21,150.56 |
| 2-26-08 | S | 1500.000 SH | 21.2000 | Citigroup Capital TR IX TRUPS 6% B/E | 31,539.65 |
| 2-28-08 | S | 1500.000 SH | 15.2573 | FT Global Nat Res | $22,885.95 |
| 7-24-08 | B | 1000.000 SH | 26.1768 | Allied Irish Bank | $26,678.88 |

| | | | | | |
|---|---|---|---|---|---|
| **7-18-08** | **S** | **350.000 SH** | **58.8400** | **Alliance Data Sys Corp** | **$20,376.78** |
| **12-1-08** | **S** | **200.000 SH** | **8.0600** | **First Tr Enhanced Eq Fd** | **$1.523.79** |

**TRUST ACCOUNT**

34. At account inception on November 31, 2005 the Trust account total portfolio value cannot be ascertained as the Variable and other annuities had not transferred to the Stifel Account. As of March 31, 2006 all the annuities had transferred and had a total value of $488, 364.97. Aside from the annuities, the Trust Account had assets valued at $699,452 at Stifel. In 2006 there were a total of $1,221,950 in buys and sells. In 2007 there were

another $666,883 in buys and sales. Through September 30, 2008 and Harrison's

departure there were $1,053.000 in buys and sales.


35.The non annuity portion of the account had declined in value to $425, 140.00. So from

account inception to Harrison's departure there had been over $2, 941,833.00 in

transactions. But on 2-29-08  with the equity positions valued at $178, 664 and ending on

August 30, 2008  valued  at $105,759  Harrison churned $251,033 in sales and purchases

of bank and other financial equities on the last day of the  month  February 29,2008. This

would   result in an annual turnover ratio on equities in excess of 700 on one day alone

concentrated in one sector-financial; a sector Stifel's own analysts had given strong

warnings along with everyone from Paul Volcker to Warren Buffet.


 36. For the months of January and February, 2008 alone, Harrison bought and sold

$ 584,000 in equities on from a net equity position of $73,239.59 as of December 31,

2008. This turnover rate that would have generated $3.5-million in  transactions in

equities in the Trust Account alone if continued through the year at an annual turnover

ratio of 47.  Bells, whistles and warnings should have been sounding in Edwardsville and

501 North Broadway based upon the excessive amount and concentration of the

transactions on February 29, 2008 alone. Yet, Harrison remained, like the drunken

captain of the Exxon Valdez, certain to founder on a rock.  All the transactions in the

Trust account demonstrate a consistent pattern of end of the month or mid-months trades

which are inexplicable based upon Stifel's own research.

36.  Mr. Thompson's withdrawals from the account were a total of $185,950 in calendar years 2006, 2007, and 2008, It is believed that the commissions and fees generated trust account in this period vastly exceeded Mr. Thompsons own withdrawals.

**TRUST ACCOUNT TRANSACTIONS AT STIFEL**

**NOVEMBER 18, 2005 TO DECEMBER 31, 2008**

| | | | | | |
|---|---|---|---|---|---|
| **11-18-05** | **S** | **200.0000 SH** | **57.5740** | **Barr Pharmaceuticals** | **$11,307.11** |
| **1-12-06** | **B** | **50,000.000 SH** | **99.7500** | **NY Tel Co** | **$50,336.94** |
| **1-26-06** | **B** | **50,000.000 SH** | **97.0000** | **Lehman Brothers** | **$49,088.33** |

| Date | B/S | Shares | Price | Security | Amount |
|---|---|---|---|---|---|
| 1-09-06 | S | 400.000 SH | 45.0201 | FISERV Inc | $17,773.90 |
| 1-12-06 | S | 500.000 SH | 44.5610 | Charles River Lab Intl Inc, | $22,027.98 |
| | | 1,007.360 SH | 33.7100 | Intl Paper Co | $33,614.92 |
| 1-26-06 | S | 250.000 SH | 60.5900 | Canon Inc | $14,965.26 |
| | | 1500.000 SH | 17.9900 | Nokia Corp | $26,650.00 |
| | | 500.000 SH | 39.7700 | Q Logic Corp | $19,628.63 |
| 2-14-06 | B | 15,000.000 SH | 100.0000 | Eastman Kodak 7.25 | $15,282.92 |
| 2-07-06 | B | 226,091.000 SH | 20.3900 | AMCAP Fund Inc | $25,000.00 |
| | | 1847.746 SH | 13.5300 | Bond Fd of Am Inc CL A | $25,000.00 |
| | | 631.313 SH | 39.6000 | SmallCap World Fund Inc | $25,000.00 |
| 2-16-06 | S | 1600.000 SH | 24.9500 | Maytag Corp Pines PFD 7.87% | $39,591.77 |
| 2-27-06 | S | 400.000 SH | 24.9700 | Maytag Corp Pines PFD7.87 | $9900.88 |
| | | 500.000 SH | 34.2300 | Verizon | $16,917.06 |
| 3-1-06 | B | 238.850 SH | 20.1800 | AMCAP Fund Inc Class | $25,000.00 |
| | | 637.918 SH | 39.1900 | SmallCap World Fund Class | $25,000.00 |
| 3-30-06 | B | 563.800 SH | | Hartford Mutual Finds Inc Global Health Fund Class A | $10,000.00 |
| | | 1780.944 SH | 11.6323 | Hartford Mutual Funds I Focus Fund Class A | $20,000.00 |
| | | 1863.933 SH | 10.7300 | Hartford Mutual Fund Inc Inflation Plus Fund Class A | $20,000.00 |
| | | ,928.640 SH | 10.3700 | Hartford Mutual Fund Floating  Rate Fund | $20,000.00 |
| | | 25,000.000 SH | 101.5000 | Verizon | $25,716.02 |
| 3-30-06 | S | 500.000 SH | 47.4200 | Citigroup Inc | $23,448.25 |
| 5-10-06 | B | 15,000.000 SH | 100.0000 | FHLB Bond | $15,145.00 |
| | | 5,000.000 SH | 100.9750 | FNMA MTN | $15,136.25 |
| | | 5,000.000 SH | 97.4000 | Tribune Co | $14,797.81 |
| 5-26-06 | B | 0,000.000 SH | 95.7340 | Brunswick Corp | $9,578.40 |
| | | 11,000.000 SH | 99.0000 | Empire Dist | $11,058.72 |

45

| Date | B/S | Shares | Price | Security | Amount |
|---|---|---|---|---|---|
| | | 20,000.000 SH | 100.000 | FNMA Note | $20,571.17 |
| | | 11,000.000 SH | 102.7500 | Household | $11,345.39 |
| | | 10,000.000 SH | 96.7600 | Household Finance | $9695.36 |
| | | 10,000.000 SH | 94.7500 | John Hancock | $9494.22 |
| 5-10-06 | S | 1700.000 SH | 22.7500 | MCI Inc | $8,000.00 |
| | | 300.000 SH | 22.7500 | First Trust / Value Line | $38,272.77 |
| | | 300.000 SH | 22.7615 | First Trust / Value Line | $6,758.32 |
| 5-11-06 | S | 1000.000 SH | 12.5000 | Delphi Trust I PFD | $12,277.24 |
| 5-26-06 | S | 2700.000 SH | 21.9300 | Eaton Vance Tax Adv Global Dividend Income | $58,710.90 |
| | | 317.331 | 21.9600 | Eaton Vance Tax Global Dividend Income | $6904.73 |
| 8-23-06 | B | 572.917 | 38.4000 | Hartford Mut Fd Inc Cap Apprec Fd Cl A | $22,000.00 |
| | | 1043.643 | 21.0800 | Hartford Mut Fd Cls A | $22,000.00 |
| | | 2022.059 | 10.8800 | Hartford Mut Fd Total Return Fd Cl A | $22,000.00 |
| 8-30-06 | B | 2677.376 | 7.4700 | Hartford Mut Fds Inc Global Comm Cl A | $20,000.00 |
| 8-23-06 | S | 500.000 | 28.0000 | PETCO Animal Supp | $13,793.22 |
| | | 2000.000 | 12.880o | Pioneer Tax Adv | $25,407.19 |
| | | 500.000 | 34.5200 | Verizon | $12,025.87 |
| | | 150.000 | 66.9100 | Zimmer Holdings Inc | $9879.69 |
| 8-30-06 | S | 1000.000 | 23.8500 | NFJ Dividend Pre Interest & Stategy | $23,537.36 |
| 11-30-06 | B | 5000.000 | 10.2562 | Adv Disc Cvrd Cl Inc | $51,281.00 |
| 11-27-06 | S | 50,000.000 | 101.0000 | NY Tel | $52,235.28 |
| 11-30-06 | S | 1000.000 | 10.76000 | SMURFIT | $10,536.23 |
| 12-29-06 | B | 800.000 | 24.0500 | SMURFIT | 19,619.49 |
| | | 200.000 | 24.0000 | SMURFIT  Corp | $ 4,899.68 |

| | | | | | |
|---|---|---|---|---|---|
| 10-16-07 | B | 1,400.000 | 25.7999 | PHH Corp | $36,652.17 |
| | B | 300.000 | 25.8310 | PHH Corp | $ 7,862.44 |
| | B | 300.000 | 25.8200 | PHH Corp | $ 7,859.08 |
| 10-31-07 | S | 45,000.000 | 1.0000 | Cash Mgmt Tr Am. | $45,000.00 |
| | S | 2,511.000 | 12.9723 | FT Energy | $32,573.45 |
| 11-30-07 | B | 1,000.000 | 20.0600 | ABN AMRO 6.08% | $20,065.00 |
| | B | 1,000.000 | 21.5800 | Aegon NV Perpetual | $21,585.00 |
| | B | 1,000.000 | 21.7900 | CBS Corp | $21,795.00 |
| | B | 1,000.000 | 19.4900 | National City Cap | $19,495.00 |
| | B | 1,000.000 | 21.3300 | Royal Bank Scotland | $21,335.00 |
| 11-27-07 | S | 40,000.000 | 1.000 | Hartford Mut Fd MM | $40,000.00 |
| 12-28-07 | B | 1,200.000 | 20.1800 | BAC Cap Trust | $24,221.00 |
| | B | 1,000.000 | 25.8500 | Fed Nat'l Mortgage | $25,855.00 |
| | B | 1,000.000 | 20.3800 | ING Group N V | $20,285.00 |
| | B | 1,000.000 | 21.0200 | Merrill Lynch | $21,025.00 |
| 12-03-07 | S | 100,000.000 | 1.0000 | Cash Mgmt | $100,000.00 |
| 12-06-07 | S | 500.000 | 52.6300 | Best Buy Co Inc | $26,109.59 |
| | S | 1,000.000 | 31.8800 | Tribune Co | $31,674.51 |
| 12-21-07 | S | 115,360.170 | 1.0000 | Cash Mgmt Tr Am | 115,360.17 |
| 12-28-07 | S | 5,000.000 | 8.1572 | Adv Disc Cvrd Cl | $40,786.00 |
| 01-15-08 | B | 750.000 | 37.9400 | Bank of America | $28,960.06 |

| | | | | | |
|---|---|---|---|---|---|
| | B | 2,000.000 | 11.2200 | Citizens Comm Co | $22,845.00 |
| | B | 2,000.000 | 17.1899 | Countrywide Cap Tr | $35,034.89 |
| | B | 500.000 | 33.5384 | Gannett Co Inc DE | $17,119.57 |
| 01-30-08 | B | 60,000.000 | 100.000 | Wash Mut Inc 8.25 | $61,696.25 |
| 01-31-08 | B | 1,100.000 | 11.3800 | Myers Ind Inc | $12,746.82 |
| | B | 400.000 | 11.3900 | Myers Ind Inc | $ 4,637.46 |
| 01-31-08 | S | 2,037.869 | 13.1400 | Bond Fd of Am Cl A | $26,777.60 |
| 01-31-08 | S | 69,787.450 | 1.0000 | Hartford Mut Fd MM | $69,787.45 |
| | | | | | |
| 02-21-08 | B | 2,400.000 | 25.0000 | Keycorp Cap X Tr Fd | $60,000.00 |
| 02-29-08 | B | 2,000.000 | 10.8500 | Citizens Comm Co | $22,106.13 |
| | B | 1,500.000 | 25.0000 | Colonial Bancgroup | $37,500.00 |
| | B | 1,700.000 | 7.6600 | Royal Bank Scotland | $13,281.41 |
| | B | 1,200.000 | 7.6800 | Royal Bank Scotland | $ 9,396.06 |
| | B | 700.000 | 7.6000 | Royal Bank Scotland | $ 5,488.17 |
| | B | 400.000 | 7.6700 | Royal Bank Scotland | $ 3,127.94 |
| | B | 7,000.000 | 88.2500 | SLM Corp 5.125 | $ 6,190.47 |
| | B | 13,000.0008 | 4.0000 | SLM Corp   STP | $11,231.94 |
| 02-20-08 | S | 2,000.000 | 11.1400 | Hartford Mut Fd | $22,358.78 |
| 02-26-08 | S | 1,300.000 | 13.9701 | Myers Ind Inc | $17,978.93 |
| | S | 190.000 | 13.9700 | Myers Ind Inc | $ 2,627.67 |
| | S | 10.000 | 13.9750 | Myers Ind Inc | $    133.34 |
| 02-29-08 | S | 1,000.000 | 22.2701 | ABN AMRO 6.08% | $22,064.85 |
| | S | 1,000.000 | 22.4600 | BAC Cap Tr VIII 6% | $24,480.72 |
| | S | 100.000 | 22.4601 | BAC Cap Tr VIII 6% | $ 2,225.98 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | S | 1,000.000 | 22.9500 | ING Group NV | $22,744.74 |
|  | S | 700.000 | 23.8600 | Royal Bank Scotland | $16,561.81 |
|  | S | 200.000 | 23.9000 | Royal Bank Scotland | $ 4,734.94 |
|  | S | 100.000 | 23.8700 | Royal Bank Scotland | $ 2,366.97 |
| 06-30-08 | B | 750.000 | 38.9200 | Bear Stearns | $29,195.00 |
| 06-25-08 | S | 2,000.000 | 18.4100 | Countrywide Pfd 7% | $36,414.79 |
| 07-18-08 | B | 1,500.000 | 16.5800 | Lehman Bro PFD | $24,875.00 |
|  | B | 200.000 | 12.7000 | Nat'l City Cap Tr 8% | $ 2,545.00 |
| 07-24-08 | B | 1,000.000 | 18.0000 | Lehman Bro PFD | $18,005.00 |
|  | B | 1,000.000 | 21.2000 | Merrill Lynch | $21,205.00 |
|  | B | 1,000.000 | 16.8700 | Nat'l City Cap Tr 8% | $16,875.00 |
| 07-31-08 | B | 1,400.000 | 18.2500 | Citigroup Cap Tr 6% | $25,550.00 |
|  | B | 800.000 | 18.2500 | Citigroup Cap Tr 6% | $14,600.00 |
|  | B | 200.000 | 18.1900 | Citigroup Cap Tr 6% | $ 3,638.00 |
|  | B | 100.000 | 18.1900 | Citigroup Cap Tr 6% | $ 1,824.00 |
| 07-24-08 | S | 1,000.000 | 35.5600 | Clear Channel Com | $35,204.80 |
| 07-31-08 | S | 750.000 | 32.9400 | Bank of America | $24,499.86 |
|  | S | 500.000 | 42.5000 | JP Morgan Pfd 6.15% | $21,111.54 |
|  | S | 143.000 | 41.1300 | JP Morgan Pfd 6.15% | $ 5,986.41 |
|  | S | 100.000 | 42.1800 | JP Morgan Pfd 6.15% | $ 4,191.30 |
|  | S | 7.000 | 42.4500 | JP Morgan Pfd 6.15% | $    295.27 |
| 08-14-08 | B | 1,000.000 | 26.3200 | Allied Irish Bank | $26,699.85 |
|  | B | 300.000 | 26.2900 | Allied Irish Bank | $ 8,005.82 |

49

|          |   |         |         |                       |            |
|----------|---|---------|---------|-----------------------|------------|
|          | B | 300.000 | 26.3400 | Allied Irish Bank     | $ 8,016.14 |
|          | B | 200.000 | 26.3000 | Allied Irish Bank     | $ 5,335.91 |
|          | B | 200.000 | 26.3500 | Allied Irish Bank     | $ 5,346.06 |
| 08-11-08 | S | 4,000.000 | 12.3600 | Frontier Comm       | $49,034.72 |
|          |   |         |         |                       |            |
| 10-30-08 | B | 560.748 | 26.7500 | Davis NY Ven Cl A     | $15,000.00 |
|          | B | 644.330 | 23.3800 | Investment Co Am      | $15,000.00 |
|          | B | 821.018 | 18.2700 | Keeley Fd Inc Cl A    | $15,000.00 |
|          | S | 1,200.000 | 18.2600 | Nat'l City Cap Tr 8% | $21,906.87 |
|          |   |         |         |                       |            |
| 12-15-08 | S | 1,000.000 | 5.3608 | Allied Irish Bank      | $5,177.60  |
|          | S | 2,500.000 | 0.0010 | Lehman Bro Pfd 7.95% $ | -0-       |

37. No later than November 15, 2007, Stifel should have detected and prevented this drunken sailor or gambler from continuing with the firm, especially given the circumstances of his prior termination. The following trades in Mr. Thompson IRA and Trust Account were unsuitable for any retiree and perhaps anyone but a naked short seller.  These are set forth here again to demonstrate the complete failure of Stifel supervisors and other control persons to do anything at anytime.   Once again, when the churning escalated to remarkable levels in financial and real estate sector investments in

the fourth quarter of 2007, despite the flight of knowledgeable investors and contrary to Stifel's own analysts; Stifel's failure to detect and prevent Harrison from damaging Mr. Thompson and other customers is inexplicable.

### IRA

| 11-15-07 | B | Wachovia Capital Trust PFD | 7.83% | 2000 SH | $50,000.00 |
|---|---|---|---|---|---|
| 12-25-07 | B | CitiGroup TA B/E | 6% | 1500 SH | $28,225.00 |
| 02-26-08 | B | CitiGroup TA | | 1500 SH | $31.539.65 |
| 02-26-08 | B | SunTrust Capital | | 1500 SH | $37,500.00 |
| 02-29-09 | B | Colonial Banc Gr notes | 8.875% | 1000 SH | $25,000.00 |
| 07-24-08 | S | Allied Irish Banc PLC | | 1000 SH | $26,678.88 |
| 07-21-08 | CASH | | | | $50,000.00 |

### TRUST

| | | | | | |
|---|---|---|---|---|---|
| 11-30-07 | B | CHASE ABN AMBN Capital | 6.08% | 1000 SH | $20,065.00 |
| 11-30-07 | B | AE Gen NV Perpetual | | 1000 SH | $21,585.00 |
| 11-30-07 | B | National City Capital | | 1000 SH | $19,495.00 |
| 11-30-07 | B | Royal Bank of Scotland | | 1000 SH | $21,335.00 |
| 12-28-07 | B | Merril Lynch Perpetual PFD | 6.375% | 1000SH | $21,025.00 |
| 12-28-07 | B | ING Group NV Securities | | 1000 SH | $20,385.00 |
| 12-29-07 | B | Federal Nat'l Mtg Ass PFD | | 1000 SH | $25,855.00 |
| 12-28-07 | B | BAC Capital Trust | 6% | 1200 SH | $24,221.00 |
| 01-30-08 | B | Washington Mutual | 8.25% | 60,000 SH | $61,696.00 |
| 01-15-08 | B | Countrywide Capital | | 2000 SH | $35,034.89 |
| 02-29-08 | B | Royal Bank of Scotland | | 1000 SH | $23,663.72 |
| 02-29-08 | B | ING Group NV | | 1000 SH | $22,744.74 |
| 02-29-08 | B | BAC Capital Trust | 6% | 1200 SH | $26,705.72 |
| 02-29-08 | B | ABN AMBO Capital | | 1000 SH | $22,064.00 |
| 02-29-08 | B | SLM Corp | | 7000 SH | $6,125.00 |
| 02-29-08 | B | SLM Corp | | 13,000 SH | $11,231.00 |
| 02-29-08 | S | Royal Bank of Scotland | | 400 SH | $3127.00 |
| 02-29-08 | S | Royal Bank of Scotland | | 700 SH | $5488.00 |
| 02-29-08 | S | Royal Bank of Scotland | | 1200 SH | $9396.00 |
| 02-29-08 | S | Royal Bank of Scotland | | 1700 SH | $13,281.00 |
| 02-29-08 | B | Colonial Bank Corp | | 1500 SH | $37,500.00 |
| 02-29-08 | B | KeyCorp Capital | | 60,000 SH | $60,000.00 |
| 02-29-08 | B | Countrywide | | 2000 SH | $36,414.78 |
| 06-25-08 | B | Countrywide | | 2000 SH | $36,414.78 |
| 06-30-08 | B | Bearstearns | | 750 SH | $29,195.00 |
| 07-31-08 | B | CitiGroup Capital | | 2500 SH | $45,612.00 |
| 07-24-08 | B | National City | | 1000 SH | $16,875.00 |

| 07-28-08 | B | Merril Lynch DEPSH | 8.625% | 1000 SH | $21,205.00 |
| 07-24-08 | B | Lehman Bros Holdings | | 1000 SH | $18,005.00 |
| 07-18-08 | B | National City Trust | 8% | 200 SH | $2545.00 |
| 07-18-08 | B | Lehman Bros Holdings | 7% | 1500 SH | $24,875.00 |
| 08-14-08 | S | Allied Irish Bank | | 2500 SH | $53,401.00 |
| 10-30-08 | B | National City Capital | | 1200 SH | $21,906.00 |

# I. FIRST CLAIM FOR RELIEF – CHURNING

28. Neal Rolla Harrison controlled Mr. Ken Thompson's IRA and Trust accounts.  All trades instituted were made by Harrison without any prior approval by Mr. Thompson.
 The trading in both accounts was excessive in light of Mr. Thompson's objectives and dispute exists as to whether Mr. Thompson's investment objectives were properly

documented in Stifel's records and to the detriment of Mr. Thompson.  Churning is defined as excessive trading in a customer's account for the purpose of generating commissions.

29. Harrison controlled the account. All purchases and sales were not authorized in advance by Mr. Thompson. While it may well be contended that the failure to object to the trades after regularly receiving confirmations precludes an unauthorized trading claim, it does demonstrate conclusively that even without discretionary trading authority, Harrison controlled the accounts.

30. The commissions and fees are excessive and represent intent to defraud. See **Mihara v. Dean Witter** 619 F.2d 617, 821 (9th Cir 1980)  quoted above

 Whether trading is excessive is a question which must be examined in light of the investment objectives of the customer. While there is no clear line of demarcation, courts and commentators have suggested that an annual turnover rate of six reflects excessive trading. See Rolf v. Blyth, Eastman, Dillon & Company, 424 F.Supp., at 1039. See also Churning by Securities Dealers, 80 Harv. L.Rev. 869 (1967). **Hecht v. Harris Upham & Company, 283 F.Supp. 417** (N.D.Cal., 1968), aff'd at 430 F.2d 1202, 1210 (9th Cir., 1970), this Court affirmed a finding of churning where an account had been turned over 8 to 11.5 times during a six-year ten-month period. In that case, 45% of the securities were held for less than six months, 67% were held for less than nine months, and 82% were held for less than a year. Under this Court's holding in Hecht, the evidence in the present case clearly supports a finding of excessive trading.
    With regard to the second prerequisite, we believe that Gracis exercised sufficient control over Mihara's account in the present case to support a finding of churning. The account need not be a discretionary account whereby the broker executes each trade without the consent of the client. As the Hecht case indicates, the requisite degree of control is met when the client routinely follows the recommendations of the broker. The present case, as in Hecht, reflects a pattern of de facto control by the broker.

The third requisite element of a 10b-5 violation scienter has also been established. The manner in which Mihara's account was handled reflects, at best, a reckless disregard for the client's investment concerns, and, at worst, an outright scheme to defraud plaintiff

39. If the broker can show that the investor was making his or her own decisions and the broker was merely following orders, it is difficult for the investor to prevail. For Harrison

to make such a contention would continue a pattern of mythic imprudence. Here the broker, made all the decisions and there is excessive and detrimental activity, Here, Mr. Thompson's account statements and the continued unauthorized trading of the account, scores of short term trades in mutual funds, Mr. Thompson's lack of sophistication, Harrison's on going personal loans from clients, Mr. Thompsons retirement age and needs, along with a pattern and practice of generating commissions at the middle and end of the month, and the concentration of positions in the troubled financial sector beginning in November 2008  not only support, but commands an inference that the excessive trading was fraudulent.  Attached to this Statement of Claim is Exhibit 1, Mr. and Mrs. Thompson's Schedule D for calendar years 2007 and  Exhibit 2, their Schedule D for 2008, which demonstrate scores of purchases and sales of mutual funds and other securities which were sold within one (1) year completely contrary to custom and practice of holding these investments for more than one (1) year. Stifel compliance knew of such "churning"   and  having instituted a special written supervisory regime in writing for Harrison,  received  and ignored weekly, monthly, and annual exception reports, which must have disclosed the astronomical  levels of trading in Thompson's accounts after September 2007. Hence Stifel, through its compliance employees responsible for monitoring the exceptions reports and special written supervisory regime for Harrison, knew of the churning and within the course and scope of employment ratified  the churning.

40. As a direct and proximate result of the violations of Rule 10b-5, in both accounts Mr. Thompson sustained damages in 2007 and 2008 including the total amount of the commissions generated from both accounts and the diminution in the value of both accounts. It is believed the excessive commissions from both accounts were in excess of

$300,000.00.   Along with the suitability violations alleged below Mr. Thompson sustained a diminution in the value of both accounts in excess of $700,000.00. Attached as Exhibit 3 is the Select Sector SPDR Chart reflecting performance of the financial sector as opposed to other industry sectors.  The liquidation of cash management funds and mutual funds held less than one (1) year, and the concentration of all sales proceeds in the troubled financial and real estate sectors demonstrates that the loss in portfolio value claimed to be $700,000 is reasonable.  As demonstrated by Exhibit 3, The Financial Sector of the S & P 500 from September 1, 2007 through January 31, 2009, lost in excess of 80% of its value.  Other sectors of the S & P 500 lost between 40% (consumer discretionary) and 20% of their value (Utilities Sector).

41.  Harrison's intentional   churning in which cash management fund and mutual funds were liquidated and the proceeds used to purchase equities exclusively in the Financial Sector, not only generated enormous commissions for Harrison, Compton and Stifel, but resulted in losses in both the Thompson Trust and IRA accounts, almost exclusively due to unsuitable concentration of these proceeds in the already troubled financial sector. Any claim that Thompson would have lost 80% of both his IRA and Trust accounts (exclusive of annuities) due to the market collapse is frivolous.  Almost all of the losses stem from the reckless liquidation of cash management funds, bond funds, and other mutual funds that did not lose 80% of their value.  For example, if Harrison had not churned the accounts and sold positions in the existing cash management funds and bond funds, and other mutual funds, much less those positions held for less than one year, there would have been no commissions paid to Mr. Harrison, Compton and Stifel; the existing portfolio in September, 2007 would have continued to yield the annual amount to supply Mr. Thompson's modest withdrawals from both accounts, and the amount of principal

lost would have been approximately 12% as opposed to 80%.  Following Compton's neglect of the account, all of the securities purchased for the sole purpose of generating Harrison continuing commissions, and not in protecting Mr. Thompson, were liquidated at enormous losses following his transfer of his accounts from Stifel.

42. The fact that Harrison's intent was fraudulent, if not criminal, is illustrated by his indictment in the United States District Court for the Southern District of Illinois on one (1) count of mail fraud on May 20, 2009.  The indictment is attached hereto as Exhibit 4. While it is expected that Mr. Harrison will be present in a Bureau of Prisons Minimum Security Facility at the time of this arbitration takes place, due to Harrison's fraudulent if not criminal conduct for a likely term of between 24-36 months, Mr. Thompson will be confined for the remainder of his well deserved retirement to serious financial constraints resulting in income from the IRA and Trust accounts of approximately $24,000 a year. In addition, to his Social Security Benefits, Mr. Thompson will now be limited to approximately $24,000 a year in prudent withdrawal without an award of $1,000,000 in compensatory damages.

43. Without such an award, While Mr. Harrison will be free, but debarred from the securities industry and Stifel will generate hundreds millions of dollars from its core profit center, Mr. Thompson, will be confined for life to a retirement marked by constant financial worries, and the inability to invade principal without providing for the increasing costs of quality long term care, prescription drugs, and amounts not covered by  Medicare.

Wherefore under this First Claim for Relief,   Mr. Thompson seeks compensatory damages of $1,000,000.00, against Stifel, Harrison and Stifel, together with interest thereon from the date of filing this Statement of Claim, and attorney fees and all forum fees herein.

## II. SECOND CLAIM FOR RELIEF –FRAUD

44. Mr. Thompson repeats and realleges all the allegations of Paragraphs 1 through 43 as if more fully set forth herein.

45. Stifel as a registered broker-dealer, Harrison as a registered representative and Compton as broker and supervisor and branch manager had a duty to make all material facts known to Thompson both under the common law duties imposed by the States of Illinois and Missouri as well as under FINRA and SEC rules and regulations.

46. Harrison, Compton, and Stifel made numerous misstatements of facts and omitted key facts to Mr. Thompson:

    a. Harrison misrepresented that his termination from Edwards was voluntary and that he wanted to return to being a broker and prompted his move to Stifel. In fact, he was involuntarily terminated from Edwards for failing to follow firm policy. Further, Harrison concealed that he was hired under a special supervisory regime that required that Stifel contact his clients and monitor his bank accounts.

    b. Harrison misrepresented that the acquisition of financial sector stocks beginning in November 2007 was part of Stifel's analyst strategy to acquire equity and preferred share positions in large banks and other financial institutions.

In fact, Stifel and other industry analysts had issued warning about the financial sector and specific companies acquired.

c. After termination, Compton failed to disclose the true nature of Harrison's termination from Edwards and from Stifle and   that Harrison was subject to a written special supervisory regime at Stifel which included regular telephone contacts with Harrison's clients and that Compton as branch manager and Stifel compliance employees had failed to institute the written special supervisory regime and monitor Harrison.

d. After Harrison's termination, Compton represented that he was "too busy" to supervise all of the brokers in his branch when he knew that Harrison was subject to a special written supervisory agreement, had access on a weekly and monthly basis to exception reports which in a few minutes would have disclosed the highly questionable if, not fraudulent activity by Harrison. Compton also failed to disclose that due to the circumstances of Harrison.

e. After Harrison's termination, Compton represented he would be directly responsible for management of Mr. Thomson's account. In fact, aside from the sale of Anglo-Irish and the then worthless Lehman brother position and one mutual fund buy, Compton took no steps to reposition Mr. Thompson's accounts.

f. The churning of Mr. Thompson's accounts which accelerated to astronomic levels beginning in fourth quarter 2007 as set forth above includes all the elements of the common tort of fraud.  See **Marhara v. Dean Whittier & Co**.

619 F. 2d 814, 821-822 (9th Cir 1980); **Vogel v. AG Edwards** 801 SW. 2d 746 (Mo App 1990); **Arceneaux v. Merrill Lynch** 767 F.2d 1498 (11th Cir. 1985)

g. Stifel for the sole purpose of maintaining Harrison's book of business and the hundreds of thousands of commissions he generated, concealed and never disclosed to Harrison's customers that Harrison was operating under a special written supervisory regime, and failed to implement and execute the written supervisory regime to conceal and retain customers. After receiving Mr. Thompson's written complaint, denied same in writing without advising Mr. Thompson of the special written supervisory regime for Harrison and the other customer complaints. The express purpose of such concealment was Stifel's attempt to stifle any customer FINRA arbitration's or complaints to state, federal or FINRA regulators. This inference is buttressed from a recent review of the Stifle online Disclosures available online at www.finra.com. It appears that Thompson's written complaint was either not timely reported to FINRA as required, or reported as a $5000.00 loss, which given the losses in Mr. Thompson's accounts defies credulity

47. Such facts would be material to any investor, particularly, a retired unsophisticated investor such as Mr. Thomson.

48. Mr. Thompson relied on such facts in maintaining Harrison as his broker and opening his accounts with Stifel in 2005, continuing to allow Harrison to engage in unauthorized trading in his account until October, 2008 and in continuing to maintain his account at Stifel with Compton as his broker afterwards and such reliance was reasonable as

Harrison and Compton were respectively broker and Branch Manager in Stifel's branch office in Edwardsville.

49. The acts and omissions of Harrison, Compton, and Stifel were willful, wanton, and intentional and made in reckless disregard for Mr. Thompson's financial interests and made for the express purpose of causing Mr. Thompson to continue allowing Harrison de facto control of the account and generate excessive commissions. The omissions by Harrison and Compton were made for the express purpose of concealing and suppressing Harrison's fraudulent activity from Mr. Thompson.  Harrison is unquestionably liable for fraud.   Compton and Stifel knew and approved or even acquiesced and ratified these activities, Compton's and Stifel's acts and omissions amount to fraud.  Assuming for the sake of argument that Compton and Stifel despite the special written supervisory regime for Harrison, somehow, despite the numerous exception reports generated, the requirements to contact Harrison's customers by telephone; were unaware of the churning and  Stifel and Compton must admit they failed to exercise ordinary care in the supervision of Harrison, Stifel and  Compton's duty under federal, and state securities laws, the policies and procedures of Stifel as well as his common law duty of due care under both Missouri and Illinois law.

50.  As a direct and proximate result of the intentional misrepresentations and omissions Mr. Thompson sustained damages in 2007 and 2008 including the total amount of the commissions generated from both accounts and the diminution in the value of both accounts. It is believed the excessive commissions from both accounts were in excess of $250,000.00.  Along with the suitability violations alleged below Mr. Thompson sustained a diminution in the value of both accounts in excess of $750,000.00.

Wherefore under the Second Claim for Relief, Mr. Thompson seeks compensatory damages of  $1,000,000.00, punitive and exemplary damages of $500,000.00   together with interest thereon from the date of filing this Statement of Claim, attorney's fees, and all forum fees herein.

### III. SUITABILITY

51.  Mr. Thompson repeats and realleges the allegations of Paragraphs 1 through 50 as if more fully set forth herein

52. The NASD (Now FINRA) requires that a broker "recommend a purchase or sale only after determining that the recommendation is suitable for the customer."  NASD Conduct Rule 2210 and NYSE Rule 405 require that a broker "know his customer before recommending securities." Both rules are designed to ensure that investors have the financial resources to bear the risk of recommended investments and to ensure that brokers communicate with their customers.

53. Beginning no later than November 15, 2007 and specifically on February 29, 2008 Harrison liquidated positions in both accounts and concentrated hundreds of thousands of assets in the financial sector. Many of these purchases were in direct contradiction to Stifel's own analysts. In October 18, 2007, CNBC "Trader Talk" Stifel analyst, Christopher Mustacio, stated to Bob Pisani regarding BAC: "We do not believe this to be a 3Q07 event. Weakness in debt underwriting and sales and trading of credit and

structured products are likely to last for some time in our view". Mustacio further stated "For example, the companies' nonperforming assets increased 41% sequentially (up nearly $1 billion).  Nonperforming assets are assets that are not producing any income, but are not yet written off as a complete loss.  Residential mortgage, home equity and commercial (domestic) loans were the main reason quality declined".

54. In the Friday December 8, 2006 edition of Forbes.com in an article entitled "Broker Action For Friday, Dec 8," Annalisa Burgos reported shares of Countrywide Financial fell more than 2% after Stifel Nicolaus cut its rating on the mortgage lender to "hold" from "buy."  The analyst sited a tightening credit market during the housing slowdown. Stifel research downgraded SunTrust, Bank of America and Countrywide before Harrison purchased these securities for Mr. Thompson.

55. Moreover, as early as 2006, Federal Reserve Chairman Alan Greenspan, Former Chairman of the Counsel of Economic Advisors, Martin Feldstein and Nobel Prize winning economist Robert Schiller had warned of a serious potential of severe housing price drops in August and September.   By late 2006 Paul Kasreal, Chief Economist at Northern Trust Bank, framed the negative scenario for the financial sector "U.S. banks currently hold record amounts of mortgage related assets on their books.  If the housing market were to go into a deep recession resulting in massive mortgage defaults, the U.S. banking system could sustain huge losses similar to what Japanese banks experienced in the 1990's.  By July 5th 2007, the Financial Times estimated that potential mortgage and corporate loan defaults "might represent as much as 1/3 of the core (tier 1) banking capital for U.S. and European banks.  If further proof was necessary, that these warning

were real, the August 6th 2007 default of three (3) Bear Stearns mortgage backed CDO hedge funds represented tangible evidence that the foregoing warnings were in fact accurate projections of substantial losses in the equity and preferred shares of banks, brokerages and any financial institutions with substantial assets comprised of tranches of mortgage backed CDO's.

56. Yet, starting on October 1, 2007 and continuing through as the financial crisis accelerated, Harrison had purchased $667,351.68 in precisely these securities for Mr. Thompson's Trust Account. In July 2007 alone Harrison had purchased an additional $220, 406.18   in bank common and preferred shares including Bear Stearns. Then in August 2007, Harrison purchased another $102,438.50 in common shares of Anglo Irish Bank.

55. Given Mr. Thompson retirement status, his relative unsophistication, and his complete dependence on cash withdrawals from both accounts, Harrison's purchase of $993,359.36 in toxic securities in the Trust Account alone with the proceeds from sales of money market, mutual funds, and non-financial equities is per se unsuitable. Wherefore under this Third Claim for Relief Mr. Thompson prays for compensatory damages of $950,000.00 against Harrison, Compton, and Stifel together with interest thereon from the date of filing this Complaint, and attorney fees and all forum fees herein.

## IV. CONTROL PERSON LIABILITY SECTION
## 1934 SECURITIES EXCHANGE ACT 15 U.S.C Sec.78t

56. Mr. Thompson repeats and realleges the allegations of Paragraphs 1 through 56 as if more fully set forth herein.

57.  Section 20 (a) of the 1934 Securities Exchange Act (15 U.S.C Sec. 78t)  renders Stifel as broker dealer and Roger Compton as branch manager liable for the acts of Harrison. See **Harrison v. Dean Witter,** 79 F.3d 909 (7nth Cir. 1996) and **Seymour Summa Vista Cinema**, 817 F.2d 609 (9nth Cir. 1987)

58.  Failure to supervise Harrison particularly in light of his prior employment history and  failure to perform and monitor Harrison's activities under a special written supervisory regime  demonstrate a total lack of  supervision, despite knowledge of Harrison's prior termination,  the creation of a  written special supervisory regime for Harrison, failure to contact Harrison's customers, including a customer with

59.  Failure to detect and prevent Harrison's excessive trading and concentration of Mr. Thompson's assets in the troubled financial sector especially on or after October 15, 2007 demonstrates a total failure to adequately supervise and control Mr. Harrison's securities activities.

60. Stifel is directly liable for the acts and omissions of its responsible compliance personnel and  all the acts and omissions of Neil Harrison and Roger Compton.

Wherefore under this Fourth Claim for Relief Mr. Thompson prays for compensatory damages of $1,000,000.00, together with interest thereon from the date of filing this Complaint and attorney fees and all court costs herein

## V. NEGLIGENCE, BREACH OF FIDUCIARY DUTY, AND NEGLICENT HIRING, ENTRUSTMENT AND RETENTION

61. Mr. Thompson repeats and realleges the allegations of Paragraphs 1 through 60 as if more fully set forth herein.

62. Stifel as a broker dealer registered with the Securities and Exchange Commission and the NASD had a duty to review the circumstances of Harrison's termination and, in light of a termination for cause had a duty to contact all of Harrison's customers and the Compliance Department of A.G. Edwards prior to allowing Harrison to become a registered representative with Stifel. In fact, Stifel knew of Harrison's gambling addiction and instituted a special written supervisory regime requiring telephone contact with Harrison's customers and other special supervisory procedures. Mr. Thompson was never contacted.

63. Stifel breached its duty of due care by hiring Harrison knowing of the circumstances of his termination by Edwards reflected in a written special written supervisory for Harrison , continuing to retain Harrison without complying with its own written supervision protocol for Harrison by telephoning his customers including Mr. Thompson,

which in light of the size of the account, excessive trading activity in the Thompson

accounts, and it is believed in many  Harrison's customer accounts at Stifel.


64. As a direct and proximate result of Stifel's negligent hiring and retention of Harrison

Mr. Thompson was caused to sustain and excess of $950,000 of losses.


Wherefore under this Fifth Claim for Relief Mr. Thompson prays for compensatory

damages of $1,000,000.00, against Stifel and Harrison and together with interest thereon

from the date of filing this Complaint and attorney fees and costs expended herein


## VI. NEGLIGENT SUPERVISION


65. Petitioner repeats and realleges all the allegations of paragraphs 1 through 64 as more

fully set forth herein.


66. Stifel and Compton had a duty to supervise Harrison imposed by the federal and state

securities laws, NASD Rules and SEC Regulations, as well as Stifel's policies and

procedures. In fact, Stifel was aware that Harrison had a gambling addiction or should

have been aware of   that problem and was concerned enough about the danger Harrison presented that it instituted a special written supervisory regime for Harrison.

67. Stifel had notice from Harrison's prior termination from AG Edwards for failure to follow firm policy that Harrison presented a risk to customers such as Mr. Thompson

68. Stifel and Compton breached the duty to supervise by failure to supervise Harrison in a meaningful way at all, ignoring exception reports, failing to execute a special written supervision agreement   prepared in light of Harrison's known danger to customers, failing to telephone customers, such as Mr. Thompson, and continued to profit from the excessive commissions generated by Harrison.

69. As a direct and proximate result of Stifel and Compton's failure to supervise, detect, and prevent Harrison's  reckless, unsuitable, and  excessive trading, Mt. Thompson has been caused to sustain damages in the amount of $1,000.000.00

Wherefore under this Sixth Claim for Relief Mr. Thompson prays for compensatory damages of $1,000,000.00, together with interest thereon from the date of filing this Statement of Claim, and attorney fees and costs of court expended herein.

_____

**L. Steven Goldblatt Esq.  EDMO 68327**

Goldblatt Law Firm
L. Steven Goldblatt Esq.
8000 Bonhomme Suite 220
St. Louis, MO 63105
Tel: (314)-288-8455
Fax: (314)-569-4010
Email: lsgold7@swbell.net